**OLIVER J. OLSON & CO., a corporation, Appellant,**

v.

**LUCKENBACH STEAMSHIP COMPANY, a corporation, Appellee.**

**MARINE LEOPARD CARGO, Appellant,**

v.

**OLIVER J. OLSON & CO., a corporation, et al., Appellees.**

No. 15766.

United States Court of Appeals
Ninth Circuit.

April 27, 1960.

As Amended June 8, 1960.

---

664

Brobeck, Phleger & Harrison, Gregory A. Harrison, J. Stewart Harrison, San Francisco, Cal., for appellant Oliver J. Olsen & Co.

McCutchen, Thomas, Matthew, Griffiths & Greene, Russell A. Mackey, Norman B. Richards, Hauerken, St. Clair & Viadro, George H. Hauerken, Cyril Viadro, and McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for appellant Marine Leopard Cargo.

Lillick, Geary, Wheat, Adams & Charles, Joseph J. Geary, Allan E. Charles, Willard G. Gilson, San Francisco, Cal., for appellee Luckenbach Steamship Co.; Burlingham, Hupper & Kennedy, New York City, of counsel.

Before MAGRUDER, HAMLEY, and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge.

This is an admiralty case involving a collision at sea between the SS Howard Olson and the SS Marine Leopard.

The Leopard is a C-4 freighter 622 feet 10 inches long with a beam of 71 feet 7 inches and 10,662.53 tons gross register. The Olson was a 261-foot lumber schooner of 2,477 gross tons. The Olson left San Pedro, California, in ballast, during the afternoon of May 12, 1956, northbound for Coos Bay, Oregon. The Leopard departed San Francisco on the morning of May 13, laden with 11,766 tons of cargo, bound down the coast to San Pedro.

In the early hours of May 14, 1956, the two vessels, proceeding in opposite directions, approached Point Sur off the California coast. The night was bright and clear, and visibility was unlimited. There was a northwest wind of force two or three, a northwesterly swell, and a moderate sea. Both vessels had the lights required of a steamer navigating at night, and they were properly positioned and burning brightly.

The vessels sighted each other's lights at approximately 1:40 a. m., when they were almost sixteen miles apart, and were in sight continuously thereafter until they collided. The speed of the Leopard was about seventeen knots and that of the Olson about eight knots. In the course of their approach the Leopard turned to the right and the Olson turned to the left. They collided at approximately 2:19 a. m. at a point from three and a half to four and a half miles off Point Sur.

The collision resulted in the sinking and total loss of the Olson, the death of four of its crew members and the injury of others, and damage to the Leopard and its cargo.

Oliver J. Olson & Co., owner of the Olson, filed a libel *in rem* and *in personam* against the Leopard and its owner, Luckenbach Steamship Company. Damages in the sum of $450,000 representing the market value of the Olson, $1,268.24 for loss of cash on board, $9,543.91 for loss of ship's inventory, and an unspecified sum for unascertained losses were sought. Luckenbach answered denying liability. Luckenbach also filed a libel *in personam* against Oliver J. Olson & Co. Damages in the approximate sum of $400,000 were sought as compensation for costs of repairs to the Leopard, expenses during detention, and loss of use and profit. The Olson Company answered denying liability.

Oliver J. Olson & Co. thereafter filed a petition for exoneration from or limitation of liability pursuant to 46 U.S.C.A. §§ 181–189, inclusive. Answers to this petition asking that it be denied were

filed by Luckenbach, various cargo claimants, and one personal injury claimant.

These actions were consolidated for trial on the issues of fault and limitation of the Olson Company's liability. After a trial the district court filed an opinion, reported in 152 F.Supp. 197, determining that the collision was caused by the mutual fault of personnel on the two vessels. The court further held that the owner of the Olson was entitled to limit its liability to an amount not exceeding the amount or value of its interest in the Olson and her freight then pending.

Findings of fact, conclusions of law, and an interlocutory decree consistent with the court's written opinion were thereupon entered. It was adjudicated that both vessels were at fault for the collision and that the owner of the Olson was entitled to limitation of liability. The court ordered that the damages thereby incurred be divided between the shipowners in accordance with the law in admiralty cases of mutual fault. It was directed that the cases be referred to a United States Commissioner to take testimony and report to the court concerning matters of damage. All questions in respect to the division of damages and application of the statutes for limitation of liability were reserved for later decision.

Oliver J. Olson & Co. has appealed from that portion of the interlocutory decree wherein fault was attributed to the Olson, asserting that the collision was the sole fault of the Leopard.[1] Luckenbach has not appealed, and therefore the faults of

the Leopard are admitted and are not in issue on this appeal. Marine Leopard Cargo (Cargo), representing various claimants in the limitation of liability proceeding, has appealed from that portion of the decree wherein the liability of the Olson Company was limited.[2]

### The Issue of the Olson's Fault

The trial court determined that the Olson was at fault in two particulars: (1) in attempting to pass the Leopard starboard to starboard; and (2) in maintaining her course and speed when there was risk of collision and failing to take positive and proper action in ample time to avoid collision and the risk of collision.[3]

The Olson Company contends that its vessel was not at fault in either of these particulars, and that the trial court erred in holding otherwise.

The first of these asserted faults (attempting to pass the Leopard starboard to starboard) brings into question the applicability of Rule 18 of the International Rules for Preventing Collisions at Sea, 33 U.S.C.A. § 146b(a). Under this rule, when two power-driven vessels are meeting end on, or nearly end on, so as to involve the risk of collision, each shall alter her course to starboard so that each may pass on the port side of the other.

Rule 18 provides that vessels are deemed to be meeting end on, or nearly so, at night only if each vessel is in such a position as to see both the sidelights of

1. Appeals from interlocutory decrees determining the rights and liabilities of the parties in admiralty cases are permitted under 28 U.S.C.A. § 1292(a)(3).

2. The cargo so represented was all carried aboard the Leopard. The Olson was in ballast and had no cargo. By reason of the contractual arrangement between the Leopard and its cargo and of the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., the Leopard is not liable to its own cargo for damage caused by negligence in the navigation or management of the Leopard. The Leopard cargo may, however, recover damages from the Olson Company if that company's liability is not limited

pursuant to 46 U.S.C.A. § 183, and if the Olson as well as the Leopard is held to be at fault. Thus, on this appeal Cargo not only attacks the provision of the decree limiting the Olson Company's liability, but joins Luckenbach in defending the provision of that decree holding the Olson as well as the Leopard to be at fault.

3. The trial court determined that the Leopard was at fault in failing to sound whistle signals on her course changes and in making piecemeal changes instead of one or more definite, substantial course changes. As above noted, this determination is not here in question.

the other ahead.[4] As further indicated in this rule, an alteration of course is not required at night in cases where the red light of one vessel is opposed to the red light of the other ahead, for then they will safely pass port to port, and they must so pass. Nor is an alteration of course required where the green light of one vessel is opposed to the green light of the other, for then they will safely pass starboard to starboard, and they must so pass.

As the Leopard approached the Olson she made several course changes to the Leopard's starboard and endeavored to pass the Olson port to port. As the Olson approached the Leopard she made no course changes until the risk of collision became imminent. She then made a course change to her port and endeavored to pass the Leopard starboard to starboard.

Therefore, with regard to the asserted fault of the Olson in attempting to pass the Leopard starboard to starboard, the critical question of fact is whether the Olson saw or should have seen the red light or the red and green lights of the Leopard ahead. If she saw or should have seen the Leopard's red light ahead, the Olson should not have attempted a starboard-to-starboard passing. She should have continued her course and passed port to port. If she saw or should have seen the Leopard's red and green lights ahead, she should have altered her course to starboard and passed port to port.

The trial court resolved this question of fact in favor of the Leopard. Specifically, the court found that the vessels were situated end on, or nearly so, within the meaning of Rule 18, and each was therefore required to alter course to the starboard and pass port to port. Implicit in the finding that the vessels approached end on is the further finding that as the vessels approached each other each saw or should have seen both the red and green sidelights of the other ahead.

The Olson Company challenges this finding of fact, arguing that the evidence required a finding that the Olson saw only the green sidelight of the Leopard ahead. The Olson Company also contends that the trial court erred in excluding opinion testimony bearing upon the question as to which side of the Leopard the Olson should have passed.

This second contention will be dealt with first. The testimony which was excluded was a portion of that of Kenneth E. Kittinger. As second mate of the freighter John B. Waterman which was proceeding south shoreward of the Leopard, he had witnessed the approach of the Olson and the collision of the two vessels. Testifying by deposition, Kittinger described the positions of the Leopard and Olson as he had observed them. He stated that it had appeared to him that the Leopard and Olson were meeting on opposing courses and that the Leopard was slightly to the eastward, "which would make it apparent to me that there would be a starboard-to-starboard passing."

Two questions were then asked of Kittinger designed to elicit his expert opinion as to what alteration of courses the vessels should have made to effectuate a safe passage, and what the circumstances called for with respect to "the duties and obligations" of the Olson and Leopard.[5] The first such question was objected to,

---

4. The reference in this rule to "sidelights" is to the green sidelight which must be carried on the starboard side and the red sidelight which must be carried on the port side of each vessel. See Rule 2, International Rules for Navigation at Sea, 33 U.S.C.A. § 145(a) (iv) (v) and (vi).

5. The two questions were:
"Q. At the time that you made the observation that it appeared that it would be a starboard-to-starboard passing, can you tell, Mr. Kittinger, in your opinion and from your observation and from your experience of 12 years as a watch officer, what direction you believe the vessels should have changed course to widen the distance between their projected courses, if necessary, and effectuate a safe passage?"

"Q. Taking the position that you have plotted for the Olson and for the Leopard at 0204 and considering that all you have is merely the opportunity of see-

and the objection was sustained, on the ground that Kittinger did not know the courses of the Leopard and Olson and therefore could not possibly determine what course alterations they should have made.

The second of these questions was objected to on the same ground and on the further ground that the question called for a conclusion of law which was for determination by the trial court. The objection to the second question was sustained upon this second ground.

Persons of nautical skill and experience are usually permitted to express an expert opinion with regard to any disputed question of navigation not controlled by statutory rules of navigation. The City of Washington, 92 U.S. 31, 39, 23 L.Ed. 600.[6]

Here, however, except for the possible existence of a "special circumstance," to be discussed below, the side of passing and the course changes, if any, which the Leopard and Olson should have made were prescribed by Rule 18, depending upon what sidelights each vessel saw. It follows that unless the "special circumstance" rule applied there was no room for an expression of opinion by Kittinger as to course alterations which should have been made, or the duties and obligations of the Olson and Leopard in this meeting situation.[7]

A departure from the rules for navigation, including Rule 18, may be necessary under special circumstances in order to avoid immediate danger. Rule 27, International Rules for Navigation at Sea, 33 U.S.C.A. § 146k. Kittinger testified that in his opinion a special circumstance confronted the Olson, consisting of the presence of the Waterman to the port of the Leopard.[8] Because of this circumstance, Kittinger stated, he would not have considered passing between the Leopard and the Waterman in order to pass to the Leopard's port, if he had been navigating the Olson. Nor would he, Kittinger testified, have considered crossing in front of the Waterman for the purpose of passing to the port of both southbound vessels.

■ It may be that a like expression of opinion was sought in asking the two questions concerning which objections were made and sustained. If so, such expressions would have been cumulative and their exclusion was not prejudicial.

■ Apart from this, however, it would appear that the Olson Company is in no position to rely on the special circumstance rule. The invoking of that rule here presupposes that except for such circumstances a port-to-port passing pursuant to Rule 18 would have been required. In that event the Olson would have been obliged, upon perceiving the

---

ing what you saw on the radar scope, what did that situation indicate to your mind with respect to the duties and obligations of those two ships?"

6. As stated in Griffin on Collision, sec. 274, page 631 (1949): " * * * such evidence is clearly admissible on questions of the usages of navigation, arising outside the scope of the statutory rules * * *."

7. Kittinger could, of course, testify as to any facts or express an expert opinion based on his observations as to what sidelights the Olson and Leopard saw or should have seen. Kanatser v. Chrysler Corp., 10 Cir., 199 F.2d 610, 618. He did testify that not being on either the Leopard or Olson he would not be able to say what lights of the other either of them would see. He also testified that

while the Leopard and Waterman were on apparently parallel courses he had no knowledge of the actual courses of the Leopard and Olson. Kittinger further testified that the Olson seemed to him to be somewhat westward of the Leopard, and gave other testimony from which conclusions could be drawn as to the relative positions of the two vessels.

8. The Leopard and the Waterman were proceeding along roughly parallel courses down the coast, with the Leopard seaward of the Waterman. When the Leopard overtook the Waterman about nineteen minutes before the collision the two vessels were a half mile apart. At the time of the collision there was between three quarters of a mile and a mile of water between the Waterman and the other two vessels.

circumstance, to alter course to its port so at to pass starboard to starboard.

The Olson, however, made no course change until the risk of collision became imminent. It is therefore clear that Second Mate Felix Zinkiewicz, who was on the bridge of the Olson at the time, did not consider that he was faced with a special circumstance warranting departure from rule 18.[9] He was simply proceeding on the basis that he was green to green with the Leopard and therefore would pass safely starboard to starboard without altering course.

■ Matters pertaining to the examination of expert witnesses rest largely within the discretion of the trial court. Andersen v. United States, 9 Cir., 237 F.2d 118, 125. For the reasons stated above we hold that the trial court did not abuse its discretion in sustaining the objections to the questions propounded to Kittinger.

This brings us to the Olson Company's principal contention on this branch of the case, that is, its challenge to the finding of fact that as the vessels approached each other they each saw or should have seen both sidelights of the other.

The testimony of personnel on the two vessels which collided was in sharp dispute on most points pertinent to this finding of fact. They disagreed as to the positions of the two vessels at various times, the courses and course changes, and the running lights which could or could not be seen.[10] This conflict in the testimony is discussed at considerable length in the opinion filed by the trial court and need not be repeated here.

Observing that the two versions of the facts are irreconcilable, the trial court stated that it found the Leopard's witnesses more credible. The court therefore accepted their version. In its opinion the trial court discussed some of the factors which influenced it in placing credit in the Leopard's witnesses. The Olson Company questions some or all of the reasons so discussed, but we do not find these arguments of appellant convincing.

That company, however, places chief reliance upon the contention that its case is not dependent upon the credibility of any witness with respect to any point which is contradicted. What is meant by this, apparently, is that if all of the conflicting testimony of personnel on the Olson and Leopard concerning the factors noted above is disregarded, there is other independent evidence not involving the matter of credibility which requires that the findings of fact be set aside.

■ As in the case of appeals governed by Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., findings of fact entered by the trial court in an admiralty case are not to be set aside unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20. This being true, it would appear that there should also be applied in admiralty cases the caution recited in Rule 52(a) that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." If, however, as appellant contends, some undisputed fact or facts render the credibility of the oral testimony extremely doubtful, the findings of the trial court, though predicated upon the credibility of witnesses, may be held to be erroneous. Arnolt Corp. v. Stansen Corp., 7 Cir., 189 F.2d 5, 10.

9. He testified, in fact, that there was enough room between the Waterman and the Leopard "to get a battleship or an aircraft carrier in there, and then some."

10. For example, as to the sidelights which were visible, the captain and third mate of the Leopard testified that they saw both the red and green sidelights of the Olson indicating an end-to-end approach and a port-to-port passing. The second mate and two seamen on the Olson, on the other hand, testified that until her last-minute starboard swing they saw only the green light of the Leopard indicating a starboard-to-starboard passing. One of the Olson's seamen, however, testified that he "momentarily" saw the Leopard's red light. The Olson Company accounts for this as due to yawing of the Leopard. Kittinger's testimony bearing upon this point was inconclusive.

The precise question, then, is whether the asserted independent evidence to which the Olson Company refers establishes without dispute facts so inconsistent with the oral testimony which the trial court has credited that we ought to override findings of fact based upon such oral testimony.

The independent evidence to which the Olson Company refers consists of five items: (1) The position of the Olson at 2:04 a. m., as testified to by the witness Kittinger; (2) the position of the Leopard at 2:04 a. m., as testified to by Kittinger; (3) the track of the Leopard, as indicated by her own course recorder; (4) the point of collision, as determined by the place where the Leopard was at 2:19 a. m.; and (5) the track of the Olson from 2:04 a. m. until a few minutes before the collision, based upon testimony concerning the Olson's course given by persons who were aboard the Olson and the asserted physical fact that the track contended for by the Olson Company was the only course that could get the Olson from her 2:04 a. m. position to the point of collision in the time allotted.

It is argued that these five items of evidence prove that the approach of the vessels was green to green, starboard to starboard. A chart attached to the Olson Company's brief, purporting to translate this independent evidence into positions and courses, shows the two vessels approaching green to green with a safe starboard-to-starboard passing indicated except for the Leopard's course changes to her starboard during the last few minutes preceding the collision.

These items of evidence unquestionably have great probative value. However, the issue here is not what weight the trial court could have given these items of evidence, but whether the court was required to give them controlling effect over the other evidence.

The 2:04 a. m. position of the Olson, as assertedly established by the independent evidence, was based partly on a radar bearing on the Olson made by Kittinger, who was on the Waterman at that time. It also involved a determination as to the Waterman's position at that time arrived at in a manner to be described. The Olson Company asserts that the radar bearing showed that the Olson was "exactly" five degrees off the Waterman's starboard bow and "exactly" six miles away. Kittinger, however, did not testify that this bearing and distance were exact.[11]

Kittinger did not write down his 2:04 bearing on the Olson, but plotted it on his radarscope with a grease pencil which, he said, "is easily wiped off." It is debatable whether or not the limitations and inaccuracies to which radar is subject could have affected the reading which Kittinger obtained at 2:04.[12] There is also room for arguing that Kittinger's 2:04 radar bearing on the Olson is inconsistent with Zinkiewicz's testimony concerning the Olson's 320-degree course. Unless, as the Olson Company asserts and Luckenbach denies, the Olson experienced a westerly "set" as it proceeded up the coast, it could not have been at the point where Kittinger's 2:04 bearing showed it to be.

11. Kittinger testified:
"I took a bearing at 2:04 and had him bearing five degrees on my starboard bow, which would be 158 true, six miles distance.
\* \* \* \* \*
"Q. (By Mr. Harrison): And for those reasons you say——— A. at 0204 I had the Olson at six miles; the Leopard was just forward of my beam.
\* \* \* \* \*
"Q. Now, at 2:04 was the only time that you took a plot on the Howard Olson? A. That is correct. An actual bearing and distance.

"Q. In taking that plot you reached the conclusion that she was five degrees on your starboard bow and about six miles away from you? A. Well, that was fact. I mean that was from the radar indication.
"Q. That you accept? A. That I accept, yes, sir."

12. For a discussion of some of the legal problems arising from possible technical inaccuracies, see 14 Proceedings of The Merchant Marine Council, United States Coast Guard 167, October 1957; Gilmore & Black, Admiralty, 423–424 (1957).

But, as indicated above, the determination of the Olson's position at 2:04 is based not alone on Kittinger's 2:04 radar bearing, but also upon a computation made by him in order to determine the position of the Waterman when he made that bearing. Kittinger made this computation by projecting the Waterman's course back from her radar-ascertained position abeam Point Sur 3.2 miles away at 2:16 while on a course of 153 degrees. The Olson Company asserts that this computation was made "with absolute accuracy" which "has never been questioned."

Kittinger, however, did not testify that his computation was absolutely accurate. In order to project the Waterman's course back from the 2:16 Point Sur bearing to 2:04, Kittinger had to ascertain the distance covered over the Waterman's 153-degree course between 2:04 and 2:16. He did this by applying his estimate of the Waterman's speed to the time interval between 2:04 and 2:16.

The estimate of speed was arrived at by dividing the distance traveled by the Waterman between 1:05 and 2:16 a. m. by the one hour and eleven minutes consumed between those two times. Kittinger "figured" the distance to be 18.75 miles and thereby arrived at a speed of "15.87." Kittinger testified that in making this computation he "made no allowance for that minor course change that I had at nine degrees."

By this process, which according to Kittinger required "dead reckoning," a distance of 3.17 miles between the Waterman's 2:04 and 2:16 positions was arrived at. Kittinger then projected the Waterman's course back 3.17 miles over the course of 153 degrees and thus arrived at the Waterman's 2:04 position. It was on the basis of the Waterman's position so determined and Kittinger's 2:04 radarscope reading of the Olson that the latter's 2:04 position was ascertained.

We think enough has been said to indicate that the independent evidence on which the Olson Company relies, considered alone, leaves substantial doubt as to the actual position of the Olson at 2:04.

The same conclusion is required with regard to the Olson Company's independent evidence as to the Leopard's position at 2:04. That company states in its brief that Kittinger located the Leopard at 2:04 on his radar screen and plotted it in relation to the "known" location of his own vessel. The "known" location of the Waterman at 2:04 was arrived at in the manner described above and accordingly was not established beyond dispute.

The evidence also indicates that while Kittinger observed the Leopard on his radar when she was abeam at 2:00 a. m. he made only a visual observation at the critical time of 2:04. Kittinger did not determine the exact distance between the Waterman and Leopard at 2:04. On the basis of his radar observation at 2:00 he estimated that at 2:04 the Leopard was just outside the 5/10ths range, "possibly 6/10ths" of a mile away. When asked to place on a chart the approximate position of the Leopard at 2:04, Kittinger testified: "It would only be an approximation." [13]

The third item of the Olson Company's independent evidence relates to the track of the Leopard as indicated by her own course recorder. However accurate and reliable the course recorded was, there would still inhere in the track so ascertained any error resulting from an inaccurate positioning of the Leopard at 2:04. Some uncertainty in connection with this item of evidence also arises from the dispute between the parties as to the time differential between the course recorder and the clock on the Leopard's bridge. An additional uncertainty is occasioned by the fact testified to at the trial, that a ship turning in the water is not like a locomotive on tracks, but tends

13. It should be noted that for purposes of arguing another point Luckenbach indicated that it would "assume" the accuracy of the position of the Leopard at 2:04.

to skid sideways through the water before setting on her new course.

The fourth item of evidence has to do with the point of collision. The Olson Company's independent evidence locates this point at the place where the Leopard's forward movement ceased when it came into collision with the Olson at 2:19. But it is plain that any uncertainties found to exist in connection with determining the Leopard's position at 2:04 and her track thereafter, as discussed above, would be reflected in this way of ascertaining the Leopard's position at 2:19. Moreover, a new uncertainty is interjected at this point due to the inability to accurately determine how much forward movement the Leopard experienced after it came into collision with the Olson.

The fifth and final item of independent evidence upon which the Olson Company relies relates to the track of the Olson from 2:04 to the point of collision.

The Olson Company asserts that the Olson's track after 2:04 can be determined in either one of two ways. One of these is to simply draw a line from her 2:04 position to the point of collision. The Olson Company argues that considering the Olson's maximum speed the line so drawn, as depicted on the chart attached to its brief, is the only course that could get the Olson from her 2:04 position to the point of collision in the time allotted.

Assuming this to be true, there would still inhere in such determination any error which may have occurred in fixing the Olson's position at 2:04 and the point of collision at 2:19. The possibility of errors in fixing these positions has been discussed above.

The Olson Company also argues that the track of its vessel after 2:04 can be definitely ascertained by plotting her course which, according to the testimony of all on board the Olson, was 320 degrees until a few minutes before the collision.

The beginning position of a track so plotted would be affected by any error Kittinger may have made in fixing the Olson's position at 2:04. Moreover, the asserted 320-degree course of the Olson at 2:04 was in serious dispute. The resolution of that dispute called for a determination of what westerly set, if any, the Olson experienced before and after 2:04.

We do not undertake to say that any particular area of uncertainty discussed above necessarily deprives the Olson Company's independent evidence of high probative value. We do conclude that enough uncertainty is connected with these five items so that it may not fairly be said that they were undisputed or that such items render extremely doubtful the credibility of the oral testimony relied upon by the trial court. Therefore, the independent evidence upon which the Olson Company relies does not, in our opinion, warrant disregard of the trial court's appraisal of witness credibility.

■■ We conclude that the finding of fact that as the Olson and Leopard approached each other they saw or should have seen both the sidelights of the other is not clearly erroneous. Such finding being sustained, it follows that the Olson was at fault in attempting a starboard-to-starboard passing, no special circumstance existing which warranted such passing. It is unnecessary to decide whether the trial court erred in holding that the Olson was also at fault in other respects.

### The Issue of Limitation of Liability

As before stated, Cargo, representing the owners of cargo aboard the Leopard, has appealed from that portion of the interlocutory decree wherein the liability of the Olson Company was limited. Provision for such limitation of liability is contained in 46 U.S.C.A. § 183, paragraphs (a) and (e) of which are quoted in the margin.[14]

---

14. "(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or

Findings of fact pertinent to the issue of limitation of liability were entered by the trial court after it had filed a written opinion. The court found that the master and crew of the Olson were properly licensed and competent to perform their duties; that there was no unseaworthiness of the Olson which contributed or could have contributed to the collision; that there were no owners or managing agents of the Olson aboard the Olson at the time of the collision; that the only cause of collision attributable to the Olson was the negligent navigation of the mate on watch; and that the acts or omissions of the mate were done without the privity or knowledge of the master or managing agents or owners of the Olson.

Cargo contends that the trial court erred in making these findings of fact, except the finding that the master and crew were properly licensed. Entry of these findings was error, Cargo asserts, because there was no evidence to support them.

■■ With regard to this limitation issue, the fault of the Olson in all respects found by the trial court is to be taken for granted. Petition of United States, The F.S. 231, 2 Cir., 178 F.2d 243, 252. The owner of the Olson also has the burden of proving that the acts or omissions by reason of which the Olson was found to be at fault were done, occasioned, or incurred without the owner's privity or knowledge. States Steamship Co. v. United States, on petition for rehearing and on petition for rehearing on limitation, 9 Cir., 259 F.2d 458, 464, 474. With respect to loss of life or bodily injury the privity or knowledge of the master of the Olson at or prior to the commencement of the voyage, if any, is

conclusively deemed the privity or knowledge of the owner. 46 U.S.C.A. § 183(e).

In our opinion there was ample evidence to sustain each of the questioned findings except the finding that no owners or managing agents of the Olson were aboard at the time of the collision. The general evidence bearing upon the way in which the collision occurred was sufficient to support the finding that it was not caused by unseaworthiness of the vessel. The same evidence and the additional evidence that the master and crew were duly licensed were sufficient to support the finding that the collision was caused by negligent navigation at the time, but not to incompetence of the master and crew.

■ It is recognized, of course, that there was considerable evidence tending to show that the second mate who was in charge at the time of the collision was not competent to navigate the Olson under the conditions then existing. Likewise, there was some evidence tending to show that the vessel may not have been seaworthy in some particulars. But it was for the trial court to evaluate this evidence along with all the other evidence in the case. The question is not whether there was some evidence tending to show unseaworthiness and incompetency, but whether such evidence is so overwhelming that a finding to the contrary would be clearly erroneous. We hold that it is not.

■ These findings as to causation being sustained, the owner's burden of proving that the acts causing the collision were done, occasioned, or incurred without the owner's or master's privity or knowledge became relatively light. Negligence on the bridge, unconnected

injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

"(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel."

with general incompetency or unseaworthiness, could not be attributed to an owner who was ashore or to an owner or master who was on board but not on the bridge at the time. It was definitely established that neither the owner nor the master was on the bridge.[15]

It follows that the owner sustained the burden of proof placed upon him by section 183(a) and (e), and that the questioned findings are not clearly erroneous.

The interlocutory decree is affirmed both on the issue of fault and on the issue of liability.

---

15. It is therefore immaterial whether the owner was aboard. Hence the finding that he was not, although not supported by evidence, was not prejudicial.