356 F.2d 728
 OLIVER J. OLSON & CO., a corporation, Libelant,
v.
The AMERICAN STEAMSHIP MARINE LEOPARD, etc., and Luckenbach Steamship Company, Inc., a corporation, Respondents.
LUCKENBACH STEAMSHIP COMPANY, Inc., a corporation, Libelant,
v.
OLIVER J. OLSON & CO., a corporation, et al., Respondents.
Petition of OLIVER J. OLSON & CO., a corporation, for exoneration from, or limitation of, liability, as owner and operator of the STEAMSHIP HOWARD OLSON.
 Nos. 19753-19755.
 United States Court of Appeals Ninth Circuit.
 February 9, 1966.
 Rehearing Denied March 23, 1966.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Allan E. Charles, Willard G. Gilson, Peter N. Swan, Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for Luckenbach Steamship Co.
 Brobeck, Phleger & Harrison, J. Stewart Harrison, San Francisco, Cal., for Oliver J. Olson & Co.
 McCutchen, Doyle, Brown, Trautman & Enersen, Norman B. Richards, Hauerken, St. Clair, Zappettini & Hinds, George H. Hauerken, San Francisco, Cal., for Marine Leopard Cargo.
 Derby, Cook, Quinby & Tweedt, Robert H. Thede, San Francisco, Cal., for Underwriters at Lloyds.
 Cecil F. Poole, U. S. Atty., John F. Meadows, Atty. in charge, Alexander Karst, Atty., Admiralty and Shipping Section, San Francisco, Cal., for United States.
 Before HAMLEY, MERRILL and DUNIWAY, Circuit Judges.
 HAMLEY, Circuit Judge.
 
 
 1
 This is an admiralty cause arising out of the collision between the SS HOWARD OLSON and the SS MARINE LEOPARD, on May 14, 1956. As a result of that collision the HOWARD OLSON, which was in ballast, was sunk and the MARINE LEOPARD and its cargo were damaged. The HOWARD OLSON was owned by Oliver J. Olson & Co. (Olson), and the MARINE LEOPARD is owned by Luckenbach Steamship Company, Inc. (Luckenbach). The owners of cargo aboard the MARINE LEOPARD are referred to herein as Cargo.
 
 
 2
 The issues of fault were tried early in 1957, and an interlocutory decree was entered on September 13, 1957, finding both vessels at fault. In that decree it was also found that the owners of the HOWARD OLSON were not in privity to its faults. This latter finding entitled the owners of the HOWARD OLSON to limit their liability in accordance with the provisions of the Limitation of Shipowners' Liability Act, Rev.Stat. § 4283 (1875), as amended, 46 U.S.C. § 183 (1964). The interlocutory decree was affirmed by this court, Oliver J. Olson & Co. v. Luckenbach S.S. Co., 9 Cir., 279 F.2d 662.
 
 
 3
 Pursuant to a provision of the interlocutory decree which was not challenged on the prior appeal, the causes were referred to a commissioner to take testimony and ascertain the value of the HOWARD OLSON immediately before the collision, and at the end of her voyage, together with the freight pending for the voyage, and the freight lost as a result of the collision. The commissioner was also directed to ascertain the damages sustained by the various claimants. All questions in respect to the division of damages, the application of the statutes for limitation of liability, priorities, and distribution of the limitation fund were reserved for decision by the court.
 
 
 4
 All items of damage referred to the commissioner were settled by stipulation, or otherwise disposed of, except the valuation of the HOWARD OLSON. Hearings were had on that issue resulting in a report by the commissioner valuing the vessel at $430,000 immediately prior to the collision. The commissioner's report was confirmed by the district court and a final decree was thereafter entered. Luckenbach and Cargo have appealed.
 
 
 5
 Luckenbach contends that the district court erred in overruling Luckenbach's exceptions to the commissioner's report valuing the HOWARD OLSON at $430,000. In these exceptions, as restated in Luckenbach's opening brief on appeal, it is asserted that the commissioner erred in several different respects in fixing that valuation. Some of these exceptions have to do with the factors upon which the commissioner premised his valuation, and others pertain to the rejection or disregard of certain evidence produced by Luckenbach.
 
 
 6
 Before discussing these contentions an account of the history and characteristics of the HOWARD OLSON will be helpful. This vessel was of a type known as a "Laker," having been built on the Great Lakes in 1917 for a cost of $983,171.05. The HOWARD OLSON was a steel-riveted, single screw vessel with engines astern. She was 4,100 D.W.T., 2477 gross tons, 261 feet overall length and 43 feet 6 inches overall beam. She had a lumber carrying capacity of approximately 2,100,000 feet board measure.
 
 
 7
 Olson purchased the vessel in 1946 for $116,000. At that time she was, in the opinion of underwriters, in condition to be classed A-1 with the American Bureau of Shipping. In 1950 she was equipped with radar worth $5,644. In 1952 diesel cranes were installed on the vessel at a cost of $69,000. Olson maintained the vessel in excellent condition. In February, 1956, three months before she was lost, plate renewals were effected costing $33,000. An expert expressed the opinion that the condition of the vessel in 1956 was such that she could have operated nine more years without incurring major repair.
 
 
 8
 The HOWARD OLSON had certain characteristics which well suited her for the coastwise lumber trade conducted by Olson. Among these features were the placement of her engines astern, the radar and diesel crane equipment, large hatches and square, boxlike holds. The vessel was comparatively inexpensive to operate, requiring a crew of only twenty-nine men. All of these features, taken together, contributed to her high record of average daily earnings as compared to the KAREN and BARBARA OLSON, operated by the same owner. The HOWARD OLSON, as a domestic-built and documented vessel, had coastwise privileges pursuant to Rev.Stat. § 4132 (1875), as amended, and 41 Stat. 999 (1920), as amended, 46 U.S.C. §§ 11, 883 (1964).
 
 
 9
 The HOWARD OLSON was engaged in carrying packaged lumber from deepwater ports in Washington and Oregon to Southern California and returning in ballast. There was evidence to the effect that while other vessels in the Olson fleet were to be replaced by barges, the HOWARD OLSON, because of her special features, was not to be replaced. On the other hand, there was also evidence to the effect that for several months prior to the collision the owner had been trying to sell the HOWARD OLSON. Moreover, after that vessel was lost, Olson made no effort to replace her with another freighter but, in accordance with the trend in the coastwise trade, turned exclusively to barges.
 
 
 10
 Holding that the market value of the HOWARD OLSON in May, 1956, could not be determined because there was no relevant market, the commissioner primarily used reproduction cost depreciated in reaching a valuation of $430,000. The commissioner thus accepted the opinion testimony of Andrew E. Allen, chief engineer for Todd Shipyards Corporation, and Leroy T. Kanapaux, an employee of Frank S. Martin & Sons, ship surveyors and appraisers. Kanapaux, whose testimony was principally relied upon, fixed the reproduction cost of the HOWARD OLSON at $2,949,540. Depreciation was predicated upon the so-called Martin Scale which is a declining balance depreciation of five percent reduced over the years. This produced a figure of $399,013.77, to which Kanapaux added the depreciated cost of the cranes ($33,720.71), for a total reproduction cost depreciated of $432,734.48. This method of determining the reproduction cost depreciated of the HOWARD OLSON was not challenged.
 
 
 11
 The commissioner also took into account evidence that the HOWARD OLSON was insured for $495,000, plus twenty-five percent or a total of $618,000 in the event of total loss. The commissioner also noted that the vessel's earning record was "impressive," and that, over her expectable life, she would have returned far more to her owner than her reproduction depreciated valuation. The commissioner indicated, however, that he did not consider these matters of insured value or earnings to be conclusive on valuation, but only as indicating that these factors could in no way cause him to reduce the experts' reproduction depreciated valuation.
 
 
 12
 Luckenbach questions the propriety of basing valuation of the HOWARD OLSON on reproduction cost depreciated, in view of the other evidence of valuation in the record.
 
 
 13
 The principles governing the allowance of damages for the total loss of a vessel in a collision at sea are comprehensively set forth in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155-156, 45 S.Ct. 465, 467, 69 L.Ed. 890.[1] As there stated, the measure of damages to be applied is the market value of the lost ship, if it has a market value at the time of destruction. Market value, as the Court indicated, is value "* * * such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, * * *." See, also, Barton v. Borit, 3 Cir., 316 F.2d 550, 552. Other evidence of value, such as reproduction cost depreciated, may be resorted to only where no market value can be established.
 
 
 14
 Luckenbach asserts that evidence was presented of contemporaneous sales of comparable vessels and that the commissioner's determination of the value of the HOWARD OLSON should therefore have been based upon that evidence, rather than evidence of reproduction cost depreciated.
 
 
 15
 According to the undisputed evidence, two sister ships owned by Olson, the BARBARA OLSON and the KAREN OLSON, were sold in November, 1956, for $205,000 each. These vessels were sold to foreign buyers for foreign operations. While these sales were made six months after the loss of the HOWARD OLSON, there was undisputed testimony that, by November, 1956, the market for ships had risen approximately twenty percent above the market in May, 1956.
 
 
 16
 There was also testimony that each of these vessels was generally equivalent to the HOWARD OLSON. All three vessels had coastwise privileges. The BARBARA and KAREN OLSON were regularly surveyed and maintained in class A-1 with the American Bureau of Shipping, whereas the HOWARD OLSON was not maintained in class. Luckenbach's experts testified that lack of classification would reduce the value of the HOWARD OLSON by $30,000 as compared to classified vessels.
 
 
 17
 The BARBARA and KAREN OLSON were not equipped with diesel cranes of the kind which were installed on the HOWARD OLSON at a cost of $69,000. The HOWARD OLSON may also have had other special features which made it of more value than the BARBARA or KAREN. However, on September 1, 1955, Olson offered all three vessels for sale at the same price, i. e., $250,000 each, or $675,000 for the three.
 
 
 18
 The commissioner made no finding that the three vessels were not generally comparable, or that the date of the sale of the BARBARA and KAREN, taking into consideration testimony concerning the rising market, was too far removed from the date of the HOWARD OLSON's loss. Instead, the commissioner rejected this evidence on two other grounds which we now consider.
 
 
 19
 First, the commissioner stated in his report that according to the evidence, Olson, in November, 1956, no longer had use for the BARBARA and KAREN OLSON and was replacing them with barges. The party liable for the loss of the HOWARD OLSON in May of 1956, the commissioner stated, "* * * can take no advantage from these circumstances."
 
 
 20
 But the fact that Olson decided to replace these vessels with barges does not constitute grounds to disallow evidence of their sales. Presumably every owner who sells a vessel has a reason for doing so. Unless the sale is in the nature of a forced liquidation, and that was not the case here, the reason which motivates the seller is wholly irrelevant in utilizing the sale price as a measure of the market value of a comparable ship.
 
 
 21
 Second, the commissioner stated in his report that the sale of the BARBARA and KAREN OLSON to foreign buyers does not tend in any way to prove a fair open market in the United States for coastwise privilege vessels.
 
 
 22
 In our opinion, the fact that the buyers of the BARBARA and KAREN OLSON were foreign, and desired the vessels for foreign service, is without significance. The vessels were sold in the United States, presumably for the highest price obtainable. If a domestic operator had desired the BARBARA and KAREN OLSON because of their coastwise privileges, he might have paid more; the fact that no domestic buyer appeared proves only that coastwise privileges no longer added value to these ships.
 
 
 23
 We hold that the commissioner's reasons, referred to above, for rejecting the sale of the BARBARA and KAREN OLSON as evidence of the market value of the HOWARD OLSON in May, 1956, were insufficient. This is not to say that the commissioner was necessarily required to equate the value of the HOWARD OLSON to the sale price of the BARBARA and KAREN OLSON. Variances in physical and operative characteristics might warrant some differentiation in values; however, it must also be considered that, in the fall of 1955, Olson did not differentiate in values in offering all three ships for sale.
 
 
 24
 Luckenbach also offered evidence concerning ten foreign vessels on the market in the months preceding and following the collision. The commissioner initially rejected evidence concerning five of the foreign vessels as being dissimilar. Under the evidence, however, the remaining five vessels were all similar to the HOWARD OLSON in the 1956-1957 period. We refer to the SS KALLE, SS SILENO, SS PARAME, SS MERIDA and SS DAGENHAM. These vessels were sold at various times between April, 1956 and July, 1957, for prices ranging from $137,200 to $196,000.
 
 
 25
 Olson could not have utilized any of these vessels as a replacement for the HOWARD OLSON because none of them had or could obtain coastwise privileges. On this ground the commissioner struck all the evidence pertaining to the sale of the five foreign flag vessels referred to above, in determining the value of the HOWARD OLSON. In taking this action the commissioner apparently relied upon the decision of this court in THE PRESIDENT MADISON, 9 Cir., 91 F.2d 835.
 
 
 26
 In THE PRESIDENT MADISON, it was held that the district court did not err in failing to predicate the value of a vessel lost in a collision upon her market value. The vessel in question, the HARVESTER, was a stern-wheeler of shallow draft, sturdy enough for use on Puget Sound yet small enough to negotiate the Skagit River where she was mainly utilized. It appeared from the evidence that no other ship could be secured which would answer the purpose for which the HARVESTER was designed. Under these circumstances, this court held that the trial court's conclusion that the HARVESTER had no market value was well substantiated by the evidence.[2]
 
 
 27
 THE PRESIDENT MADISON, in our opinion, does not represent a holding that the market value test is whether other vessels can be purchased in the open market to replace the one which is lost. This would run counter to the principles announced in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155-156, 45 S.Ct. 465, wherein no such replacement factor was injected. "Market value" denotes what it fairily may be believed that a purchaser in fair market conditions would have given. United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336; City of New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143.
 
 
 28
 Even in those cases where a market value cannot be established, other evidence of value resorted to is to be of a kind which will establish the sum "* * * which, considering all the circumstances, probably could have been obtained for her on the date of the collision * * *." Standard Oil, supra, 268 U.S. at 155, 45 S.Ct. at 467.
 
 
 29
 The fact that no domestic buyer bought the BARBARA OLSON or the KAREN OLSON, both of which had coastwise privileges, indicates that these privileges added no appreciable marketable value to those vessels, or to the HOWARD OLSON. Hence, even disregarding the intangible character of those privileges, as compared to the physical characteristics which rendered the HARVESTER unique in THE PRESIDENT MADISON case, the fact that the five foreign registry vessels did not have those privileges is immaterial.
 
 
 30
 In our opinion, the commissioner erred in excluding the evidence pertaining to the sales of these five vessels, and in failing to consider that evidence in determining the market value of the HOWARD OLSON. Considering this evidence and the evidence relating to the sale of the BARBARA and KAREN OLSON, the commissioner had ample evidence regarding generally contemporaneous sales of similar vessels on which to predicate a finding of the HOWARD OLSON's market value. It was therefore error for the commissioner to turn from evidence of market value to that tending to show reproduction cost depreciated in valuing the HOWARD OLSON.
 
 
 31
 In the final decree Luckenbach was required to pay into the limitation fund created by Olson, in addition to the principal amount of $30,673, seven percent interest thereon from May 14, 1956, until paid. On this appeal, Luckenbach urges that in a mutual-fault collision such as this, it is unworkable and unfair to award interest from the date of the collision. Apparently agreeing that such an interest award is, absent special circumstances, warranted in a single-fault collision, such as THE PRESIDENT MADISON, Luckenbach points out that in the case of a mutual-fault collision, there must necessarily be a balancing of damages between the two shipowners before it can be determined who is the judgment creditor and who is the judgment debtor. The award of interest back to the date of the collision, Luckenbach argues, therefore represents an abuse of discretion.
 
 
 32
 In view of the disposition we have made of the valuation issue, it seems highly unlikely that Luckenbach will be charged any interest in the revised final decree which must be entered. We therefore refrain from a discussion of this point.
 
 
 33
 Luckenbach and Cargo both contend that the district court erroneously allocated the death and personal injury claims. All claims for death and personal injury arising from the collision were settled by Luckenbach and Olson for $181,432. Each shipowner, according to a written agreement, advanced one-half of this sum to effect settlement. The agreement provided:
 
 
 34
 "Should it be finally adjudicated that either party making advances for such settlements was not under legal liability to make payment to claimants, then such advances shall be immediately refunded by the party held liable to make such payment."
 
 
 35
 In its final decree, the district court ordered Luckenbach to reimburse Olson for the $90,716 advanced by Olson pursuant to the settlement agreement. In so doing, the district court stated that "* * * in accordance with his rights of limitation Oliver J. Olson & Co. is adjudged to have been under no legal obligation to pay any amount to the death and personal injury claimants. * * *" The $90,716 was then added to Luckenbach's collision damages and accordingly decreased the offset payable to Olson for the benefit of Cargo in the limitation proceeding.
 
 
 36
 Cargo asserts that despite Olson's right to limit liability, Olson nevertheless remained legally obligated to pay death and personal injury claims from a sixty dollar per ton fund provided for in 49 Stat. 1479 (1936), 46 U.S.C. § 183(b) (1964).[3] Olson urges affirmance of the district court order contending that the prior appeal in this case resulted in a holding that it was not liable to make payments to third party claimants.
 
 
 37
 In the prior appeal, this court held that Olson was entitled to limit its liability for damages resulting from the collision and for death and personal injury claims. Oliver J. Olson & Co. v. Luckenbach S. S. Co., 9 Cir., 279 F.2d 662, 671-673. This was not an adjudication absolving Olson of liability. Olson's liability remained unchanged, although the amount recoverable became subject to the limiting provisions of section 183.
 
 
 38
 With regard to cargo claimants, it is conceivable that Olson's obligation to pay can be limited to zero under section 183(a). However, in the case of death and personal injury claimants, this result is avoided by section 183(b) which establishes a sixty dollar per ton fund for the benefit of these claimants. The HOWARD OLSON's tonnage was 2477, giving her an exposure of $148,620 to death and personal injury claims ($60 X 2477). Despite Olson's right to limit liability, death and personal injury claimants, had they retained their claims, would have been entitled to recover at least $148,620 from Olson.[4]
 
 
 39
 Olson advanced $90,716 as its share of the settlement arrangement. This sum was well within the limits of Olson's sixty dollar per ton fund; there is no conflict between the settlement agreement and the limitation of liability invoked by Olson. The fact that Olson was found to be entitled to limit liability did not amount to an adjudication that it was under no legal liability to pay within the meaning of the valid settlement agreement.
 
 
 40
 Olson argues that the sixty dollar per ton fund is designed to insure payment to death and personal injury claimants where no other source of recovery is available. And, in this case, since Luckenbach has not limited its liability, Olson contends that Luckenbach is primarily liable for these claims.
 
 
 41
 In a single-ship accident, it is true that the sixty dollar per ton fund will not be created unless the limitation fund under section 183(a) proves insufficient to satisfy the claims. However, it does not follow that the limiting ship in a mutual-fault collision can avoid liability altogether at the expense of the non-limiting ship. Liability of the ship-owners to third party claimants in a mutual-fault collision is joint and several; and the fact that a limiting ship may have to resort to a sixty dollar per ton fund does not alter the nature of its liability.
 
 
 42
 The purpose of section 183 (b) is to assure some recovery to death and personal injury claimants; there is no indication that it was also intended to alter established admiralty concepts by allowing a limiting ship to avoid primary liability in a mutual-fault collision case. Olson had no right to be reimbursed for the payments advanced to settle claims for which it was legally liable. The district court erred in reallocating the death and personal injury claims and invalidating the private settlement agreement. See In re Petition of the A. C. Dodge, Inc., 2 Cir., 282 F.2d 86.[5]
 
 
 43
 Cargo argues that the district court failed to recognize and apply the principle that the admiralty divided damages rule prevails over any limitation statute until after the balance is struck. More specifically, Cargo asserts that the full amount of the cargo damage claims against the HOWARD OLSON should have been included in its damages before the balance of damages of the HOWARD OLSON and the MARINE LEOPARD was struck. Instead, the district court, adopting the view of Luckenbach and Olson, ruled that the cargo damage should not be included in the division. This resulted in a division based primarily on hull damage, and reduced the single liability of Luckenbach to Olson which creates the limitation fund out of which Cargo could realize on its claims against Olson.
 
 
 44
 The problem thus posed involves the interplay, in mutual-fault cases, between section 3 of the Harter Act, 27 Stat. 445 (1893), 46 U.S.C. § 192 (1964), relieving a vessel owner, under indicated circumstances, from liability for loss or damage to the vessel's cargo, and Rev. Stat. § 4283(a) (1875), 46 U.S.C. § 183(a) (1964), limiting the liability of a vessel owner for loss or destruction, by collision, of another vessel or its cargo to the amount or value of the interest of such owner and her freight then pending. Also involved is the rule of law, first announced in O'Brien v. Miller, 168 U.S. 287, 18 S.Ct. 140, 42 L.Ed. 469, that, in applying the latter statute, the limiting vessel's (HOWARD OLSON's) claim against the nonlimiting ship (MARINE LEOPARD), to the extent that it represents the loss of its interest in the vessel, is still an interest in the vessel which is subject to liability.
 
 
 45
 Olson has been granted limited liability and therefore will not have to pay the full amount of Cargo's claim. The extent to which Olson must respond in damages to Cargo can only be determined after the size of the limitation fund is established; until that time, Cargo's claim is too speculative to warrant inclusion in the division of damages. Only those damage items which have been paid or will be certainly payable are includible. Luckenbach Steamship Co. v. United States, 2 Cir., 315 F.2d 598, 604.
 
 
 46
 If these claims were nevertheless included, the result would be to circumvent Luckenbach's complete exclusion from liability to its own cargo, accomplished under the Harter Act. This is true because, to the extent that cargo claims were included in Olson's damages before striking the balance, Luckenbach would be required to pay fifty percent thereof for the purposes of the limitation fund.[6] See In re Petition of the A. C. Dodge, Inc., 2 Cir., 282 F.2d 86, 89.
 
 
 47
 Cargo relies upon language to be found in THE NORTH STAR, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91. But, as Cargo concedes. THE NORTH STAR did not involve any cargo or other third-party claims. The decisional language to which Cargo points must be read in the light of that fact, which distinguishes THE NORTH STAR from the case before us. THE CHATTAHOOCHEE, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801, also relied upon by MARINE LEOPARD Cargo, was concerned with the question of recoupment by the non-carrying shipowner for amounts actually payable to the cargo interests. The non-carrying ship in that case had not limited its liability and was liable to pay cargo the full amount of its loss.
 
 
 48
 In Weyerhaeuser S.S. Co. v. United States, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1, cited by Cargo, the issue was the propriety of including in the collision damages of Weyerhaeuser, for division purposes, a personal injury settlement it had made with a member of the crew of the other colliding vessel. The crewman was precluded by statute from recovering from his vessel's owner, the United States.[7] There was no question of measuring the amount of money actually paid in settlement of the seaman's claim.
 
 
 49
 We agree with Luckenbach that the thrust of these decisions is simply that statutes governing the carrier's relations or liabilities to its own crew members or to its own cargo have no application to the non-carrier's claim for collision damages to the extent that such damages represent actual payment by the noncarrier or definite future payment of claims made against it by the carrier's crew or cargo. No such problem is involved in the case before us; the invocation of limited liability by the non-carrier renders its damages, the amount payable to Cargo, uncertain and wholly contingent upon recovery of a sum representing an interest in the HOWARD OLSON.
 
 
 50
 We conclude that the district court did not err in the respect claimed by MARINE LEOPARD Cargo.
 
 
 51
 Cargo next argues that the district court erroneously treated the item of interest on the general average disbursements.
 
 
 52
 Cargo acknowledges that when a vessel is under average, a party who incurs extraordinary expenses necessary to keep the vessel going is entitled to collect from the other parties to the voyage interest on their proportion of such extraordinary expenses. The shipowner's proportion of the interest on general average disbursements is a proper item of its collision damages. However, Cargo asserts, an anomaly and an absurdity is created where the interest on general average disbursements is allowed as a separate item of loss and interest is also allowed on all damages as in the present case. General average interest was allowed at the rate of five percent, and interest on all damages was allowed at the rate of seven percent.
 
 
 53
 In our opinion this treatment of interest accords with well-settled practice and is correct. See Moore-McCormack Lines v. THE ESSO CAMDEN, 141 F.Supp. 742 (S.D.N.Y.) mod. on other grounds, 2 Cir., 244 F.2d 198, 202. As the Court of Appeals there pointed out, the award of general average interest cannot be considered interest on damages. It is payment for the use of money which was necessary to keep the ship under way. Interest on a shipowner's general average disbursements is for a fixed period in the past and has thus been liquidated. As such, it stands no differently than any other item of general average expense.
 
 
 54
 Finally, Cargo argues, the district court abused its discretion in failing to award costs to the prevailing Cargo claimants.
 
 
 55
 No party prevailed in this litigation. As for Cargo, it set out to prove mutual fault of the vessels and to defeat Olson's right to limitation. Cargo won on the fault issue but lost on the limitation issue. The district court did not abuse its discretion in declining to award costs to MARINE LEOPARD Cargo.
 
 
 56
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 In theStandard Oil Co. case the Supreme Court said:
 "It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed. In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. The Baltimore, 8 Wall. 377, 385 [19 L. Ed. 463]. Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 123 [44 S.Ct. 471, 68 L.Ed. 934]. And by numerous decisions of this court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value [citing cases]. The same rule is applied in England [citing cases]. It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases [Simpson v. Shepard], 230 U.S. 352, 434 [33 S.Ct. 729, 57 L. Ed. 1511].
 
 
 [2]
 In THE PRESIDENT MADISON, this court said, in part (91 F.2d at page 844):
 "It is urged that the market value test is not whether other vessels can be purchased in the open market to replace the one which is lost, but rather whether the lost vessel could have been used in other services to a sufficient extent to find purchasers. So it is said that, although a Columbia River stern wheeler could not have been used on the Puget Sound-Skagit River route, the Harvester, nevertheless, could have been sold for use on the Columbia River.
 "This argument overlooks the economic reasons for the market value test and for substituting other criteria when that fails. If the Harvester had been sold for Columbia River service, she would have commanded a price measureable to vessels in that service. Her peculiarities — broad beam, exceptionally shallow draft, and other special features — would not have been reflected in the price commanded by the vessel in a market where these features were unnecessary and superfluous. Such a price could not give the owner, who needs these special features for his trade, the value of what he had lost."
 
 
 [3]
 The 1936 amendment to Rev.Stat. § 4283, 46 U.S.C. § 183(b), provides as follows:
 "(b) In the case of any seagoing vessel, if the amount of the owner's liability as limited under subsection (a) of this section is insufficient to pay all losses in full, and the portion of such amount applicable to the payment of losses in respect of loss of life or bodily injury is less than $60 per ton of such vessel's tonnage, such portion shall be increased to an amount equal to $60 per ton, to be available only for the payment of losses in respect of loss of life or bodily injury. If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts."
 
 
 [4]
 The section 183(b) fund is available only in the case of a "seagoing vessel." Section 183(f) limits the term "seagoing vessel" by listing several types of vessels which are not to be included in that term. Olson urges that these exceptions together with excerpts from the legislative history indicate that section 183(b) was not intended to increase the liability of a non-passenger-carrying vessel to its crew members. We do not agree. The restriction of section 183(b) to passenger-carrying vessels only, would be an unwarranted limitation of that statute. See In re Petition of the A. C. Dodge, Inc., 2 Cir., 282 F.2d 86, 89; 3 Benedict, Admiralty § 475 (6th ed. 1940)
 
 
 [5]
 Reversal of the district court decree in regard to the death and personal injury claims makes it necessary to provide for the possible distribution of the limitation fund. This fund should be divided, pro rata, between the cargo claims and the death and personal injury claims paid by Olson. Since Olson has paid its share of these claims, the proportion of the limitation fund allocated to death and personal injury claims can be retained by Olson. The difference between this sum and the $90,000 actually paid to claimants, represents the contribution from Olson's sixty dollar per ton fund
 Cargo suggests that under the equitable doctrine of marshalling, the death and personal injury claimants should be remanded to the sixty dollar per ton fund, leaving the limitation fund of section 183(a) entirely to cargo claimants. We do not think that this is a proper case for the application of the principle of marshalling assets. Both the wording of section 183 (b) and its legislative history make it clear that death and personal injury claimants are to share pro rata in the limitation fund and only when their proportion fails to satisfy their claims will they be remanded to the sixty dollar per ton fund. See H.R.No.2517, 74th Cong., 2nd Sess. (1936).
 Of course, this problem of distribution of the limitation fund will arise only if Luckenbach, after the final division of damages, is ordered to pay Olson a sum which represents Olson's interest in the HOWARD OLSON.
 
 
 [6]
 Although this result was condoned in THE CHATTAHOOCHEE, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801, it is a result which has not been reached in a case such as ours involving limited liability on the part of the non-carrying vessel
 
 
 [7]
 The statute involved was the Federal Employees' Compensation Act, which stood in the way of the seaman's recovering from the owner of the vessel on which he was employed