**OLYMPIC TOWING CORPORATION,**
Plaintiff-Appellee,

v.

**NEBEL TOWING COMPANY, Inc., et al.,**
Defendants-Appellants.

No. 26386.

United States Court of Appeals
Fifth Circuit.

July 9, 1969.

As Amended Nov. 24, 1969.

Rehearing Denied and Rehearing En
Banc Denied Nov. 24, 1969.
Certiorari Denied March 23, 1970.
See 90 S.Ct. 1120.

John R. Brown, Chief Judge, and
Dyer and Simpson, Circuit Judges, dissented.

John Poitevent, John W. Sims, New Orleans, La., for defendants-appellants.

Cornelius G. Van Dalen, Eldon T. Harvey, III, New Orleans, La., for plaintiff-appellee.

Edward C. Kalaidjian, New York City, for amicus curiae.

Before GEWIN, McGOWAN* and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

The appellee, Olympic Towing Corporation, brought this suit in the United States District Court for the Eastern District of Louisiana against the appellants—Nebel Towing Company, Inc. and Nebel's insurer, United States Casualty Company—to recover damages occasioned by the sinking of Olympic's vessel, the M/V CARINTHIA, allegedly resulting from the improper operation of Nebel's vessel,[1] the M/V G-H, and her tow. The suit against Nebel's insurer was brought pursuant to Louisiana's direct action statute.[2] Nebel thereafter petitioned the district court for exoneration from liability on the ground that the G-H was not the cause of the CARINTHIA's sinking; alternatively, Nebel sought to limit its liability, under the

---

* Judge Carl McGowan of the District of Columbia Circuit, sitting by designation.

1. The G-H was owned by G-H, Inc. and bareboat chartered to Nebel. For purposes of the issues in this case, a bareboat charterer is the owner. *See* 46 U.S.C. § 186 (1964).

2. La.R.S. 22:655 (Supp.1964). The statute was amended in 1962, subsequent to the events in this case, but the amended language does not affect any rights involved here.

federal Limitation of Liability Act,[3] to the amount of its interest in the G-H and the freight pending (towage charges). After a full trial, the district court found, *inter alia,* that the G-H had caused the CARINTHIA to sink but that the owner had been without privity or knowledge of any wrongdoing; accordingly, the court held that Nebel was not entitled to be exonerated but was entitled to limit its liability. However, the court held that the Limitation Act is a personal defense available only to the vessel owner; thus the court held that Nebel's insurer could not limit the amount recoverable in the direct actions.[4] Nebel and its insurer, supported by the American Institute of Marine Underwriters as amicus curiae, appeal from the court's rulings denying exoneration and holding limitation of liability to be a personal defense. Olympic cross-appeals from the court's ruling allowing Nebel to limit liability. We affirm the judgment of the district court.

## I

Virtually all the evidence in this case pertinent to the question of liability is disputed. However, a bare outline of the facts surrounding the central incident is discernible in the district court's pre-trial order. Sometime about midnight on October 19, 1961, the G-H and the CARINTHIA were traveling in opposite directions in the Gulf Intracoastal Waterway, the G-H moving westward and the CARINTHIA moving eastward and each approaching Mile 120. The G-H was towing five barges astern and the CARINTHIA was pushing two barges

ahead. Another tug, the CEPHEUS II, was following the CARINTHIA in order to take advantage of the latter's radar in case of dense fog. Mile 120 falls directly in the middle of two bends in the Waterway, which forms a sort of attenuated "S" at that point. Apparently because of the difficulty of navigating the double bend, the vessels communicated by radio and agreed that the G-H would "hold up" east of the bends and let the CARINTHIA pass port to port. The CARINTHIA subsequently passed the G-H somewhere in the vicinity of Mile 120. However, in the process of passing, the CARINTHIA veered out of the channel toward the south bank and struck an unidentified underwater object. She immediately began to take more water than her pumps could handle. When it became clear that efforts to keep her afloat would fail, she moved up the bank where she finally rolled over on her side. The district court found, as Olympic had contended, that the G-H had permitted her barges to swing beyond mid-channel, thus forcing the CARINTHIA to leave the channel in order to avoid collision. Therefore, the court concluded that the sinking of the CARINTHIA was attributable to the embarrassment of her navigation by the G-H.

 Since all testimony directly concerning the events upon which liability hinges was admitted by way of depositions, and our ability to evaluate this evidence is comparable to that of the trial court, the application of the "clearly erroneous" standard is less stringent.[5] Granting this, however, Nebel has

---

3. The pertinent portion of the Act provides:

> The liability of the owner of any vessel * * * for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 U.S.C. § 183(a) (1964).

4. The district court's order was an interlocutory decree which left for determination the amount of the insurer's liability. The order is appealable under 28 U.S.C. § 1292(a) (3) (1964). *See* Caradelis v. Refineria Panama, S.A., 384 F.2d 589, 591 n. 1 (5th Cir. 1967).

5. Caradelis v. Refineria Panama, S.A., 384 F.2d 589, 593 (5th Cir. 1967); San Pedro Compania Armadoras, S.A. v. Yannacopoulos, 357 F.2d 737, 740 (5th Cir. 1966).

gained nothing, for the fact is that we are not inclined to disturb the district court's findings. The two witnesses who testified on behalf of Olympic—the captains of the CARINTHIA and the CEPHEUS II—described the crucial events in one light, while Nebel's two witnesses—the captain and deckhand of the G-H—related entirely inconsistent details. The district court prefaced its findings of fact with this cogent statement:

A. K. Billiot was in control of a vessel, the CEPHEUS II, which was not directly involved with this litigation. Indeed, he occupies the position of a disinterested bystander, with no ostensible purpose for siding with the interests of the M/V CARINTHIA as against the interests of the M/V G-H. Also of significance is the fact that a comprehensive statement taken from Billiot within a few days of the incident involved is part of the record and does not vary in any important detail from his subsequent statement or his deposition testimony.

The testimony of Adkinson [relief captain on the G-H] is in hopeless conflict with that of Dicks [relief captain on the CARINTHIA] on virtually every critical link in the chain of events culminating in this incident. Coulter [deckhand on the G-H] who would naturally be expected to corroborate Adkinson, does so on some points, but contradicts the testimony of his captain in many significant areas.

Therefore, in arriving at its findings the Court relied heavily on the testimony of Billiot which substantiates the account of this incident as related by Dicks. Accordingly, the credence placed in the testimony of Adkinson and Coulter decreased as the gap between their account and that of Dicks and Billiot widened. Libelant bore its burden of proof, establishing a prima facie case of liability, and the

evidence adduced by respondent simply lacks the convincing force necessary to defeat libelant's claim.

It may be conceded that the record before this court contains considerable evidence favorable to Nebel's position. However, when the evidence is in complete conflict, the court must accept one version of the facts and reject the contrary version. Nebel's argument invites us to select its version and draw inferences from ambiguities which are favorable to its position. We must decline the invitation. In the circumstances of this case, we think the district court's approach was sound and that its findings are adequately supported.

Nebel also argues that, even if the tow of the G-H did force the CARINTHIA out of the channel, the sinking of the CARINTHIA was not proximately caused by the G-H because the crew of the G-H could not foresee that the CARINTHIA would strike a submerged object. Nebel relies upon testimony to the effect that it is unusual for a vessel to suffer damage when it runs outside the channel. Nebel argues that an event is not foreseeable unless it is a probable consequence of an act.

Generally, "proximate cause" in the admiralty context is defined as "that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened."[6] This definition obviously describes a cause-in-fact principle, while proximate cause in the common law is generally a question of the extent of the tortfeasor's duty.[7] Nebel here is clearly relying upon the latter concept. However, we cannot agree with Nebel's statement of the standard for determining proximate causation. We think that, in order for a risk to be foreseeable, "the consequences must be a normal, substantial part of the risk, which a reasonable man would recognize as fairly to be taken into account by the

---

6. *See, e. g.,* Olsen v. States Line, 378 F.2d 217, 221 n. 7 (9th Cir. 1967); 2 Norris, Law of Seamen § 689 (1962).

7. *See generally* Gregory, Proximate Cause in Negligence—A Retreat from Rationalization, 6 U.Chi.L.Rev. 36 (1938).

defendant at the time of his act." [8] Under this standard, it is patent that the G-H should reasonably have foreseen that some damage might result from forcing the CARINTHIA to leave the channel.

■ We must also reject Olympic's contention that Nebel should have been denied the right to limit its liability. Under the Limitation Act, a vessel owner can limit its liability only if the owner is without "privity or knowledge" of the act causing the loss.[9] Olympic attempts here to marshal sufficient facts to attribute privity or knowledge to a shareholder and officer of Nebel. However, the attempt fails because, as the district court found, there is simply nothing in the record which could be considered privity or knowledge, as broad and vague as those terms are.[10] Thus we think that the court below properly permitted Nebel to limit its liability. ·

## II

■ The appellants and the amicus curiae launch a broad scale and many-faceted attack on the district court's holding that Nebel's insurer could not take advantage of Nebel's right to limit its liability. When the question presented here was before this court over fifteen years ago, we held that limitation was not available to an insurer in a direct action suit.[11] The Supreme Court reversed in Maryland Cas. Co. v. Cushing,[12] a 4–1–4 decision which established a procedural chronology for that case and implicitly disposed of many questions raised here. Four members of the Court took the view that Louisiana's

direct action statute was in conflict with the Limitation Act and therefore that the state statute must fall before paramount federal law.[13] Four other members agreed with this court, seeing no conflict whatever.[14] However, neither faction carried the day, for Mr. Justice Clark did not agree entirely with either and his vote was necessary to form a majority. Justice Clark saw no reason to invalidate Louisiana's statute because, in his view, any conflict between the state and federal statutes could be obviated by a procedural chronology; because of the deadlock in the vote, Justice Clark's approach became the court's disposition of the case:

> Our only interest is to make certain that such [direct] actions do not interfere with the Federal Limitation proceeding. To do this we need only require that the limitation proceeding be concluded first and the owner's liability settled under it. The petitioners could then discharge this liability, to the extent their policies covered it, by paying into the limitation proceeding the proper sum. The door would then be left open for prosecution of the direct actions against the insurance companies on the remaining coverage of the policies. Thus, whatever the insurers' liability may be under Louisiana law in the subsequent direct actions, the [vessel] owner's purse cannot be touched.[15]

■ As indicated by the last sentence quoted above, Mr. Justice Clark was concerned that, if the direct actions were completed prior to the limitation proceedings, the vessel owner's insurance might be exhausted in the direct action

8. Prosser, Law of Torts § 48 at 259 (2d ed. 1955).

9. 46 U.S.C. § 183(a) (1964).

10. Gilmore & Black, Law of Admiralty 695–96 (1957).

11. Cushing v. Maryland Cas. Co., 198 F.2d 536 (5th Cir. 1952).

12. 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). See Guillot v. Cenac Towing Co., 366 F.2d 898 (5th Cir. 1966).

13. 347 U.S. at 410, 74 S.Ct. 608, 98 L.Ed. at 811 (Justices Frankfurter, Reed, Jackson, and Burton).

14. 347 U.S. at 427, 74 S.Ct. 608, 98 L.Ed. at 820 (Justices Black, Douglas, and Minton, and Chief Justice Warren).

15. 347 U.S. at 425, 74 S.Ct. at 616, 98 L.Ed. at 819.

suits and thus deprive the vessel owner of the benefit of his insurance in the limitation proceeding. In the present case, the direct action and the limitation proceeding were consolidated in the same court and, therefore, no problem of insurance-fund exhaustion is presented. We reject the contention of the appellants and the amicus that future cases will present the problem because the federal court in admiralty does not have power to enjoin claimants from continuing with direct actions in other forums —especially state forums—prior to the limitation proceeding. We have already held that the federal admiralty court has ample injunctive power for the purpose of insuring the orderly and effective operation of the Limitation Act.[16] Thus it is clear that the court has the power— and, doubtless, the ingenuity—to devise effective procedures to protect rights under both the state and federal statutes.[17]

■ The Court's disposition in *Cushing* implicitly disposed of two matters which the appellants and the amicus advert to only briefly, *viz.*, (1) the compatibility of a direct action with a concursus under the Limitation Act [18] and (2) the possibility that higher premiums would result if the insurer is held liable beyond the amount of the limitation fund, thus denying the shipowner full

benefit of the Limitation Act. With regard to the first matter, although four members of the Court would have voided the direct action statute because of conflict between the proceedings, five members, including Justice Clark, took a contrary position. Moreover, the right to proceed with a direct action after a limitation proceeding has been completed is an implicit holding that the policy underlying the concursus is not so strong or pervasive as to abrogate rights under the direct action statute. We hold that any conflict between the direct action statute and the federal provision for a concursus of claims in admiralty is so minimal as to be insignificant.

■ Regarding the matter of higher premiums, even if this question had not been implicitly disposed of by *Cushing*, we would reject the contention. To begin with, since in the vast majority of cases limitation is denied for one reason or another, it may well be questioned how significantly the possibility of limitation figures into the actuarial computation of premiums.[19] Second, since the maritime industry quite often benefits from full recovery of losses, the policy underlying the Limitation Act is perfectly compatible with spreading losses through higher premiums. For example, the interest of the maritime industry in the present case is best served by

---

16. Guillot v. Cenac Towing Co., 366 F.2d 898, 904 (5th Cir. 1966). Since the stay of a direct action would be in aid of the admiralty court's jurisdiction, the appellants' reliance on 28 U.S.C. § 2283 (1964) is misplaced.

17. It may be noted that the four dissenting Justices in the *Cushing* case argued that the direct actions should be permitted to proceed irrespective of the limitation proceeding. We do not adopt that view because a majority of the *Cushing* Court thought otherwise and, therefore, *Cushing* is probably controlling authority on this question. We do not intend to intimate, however, that the procedural chronology is inviolable. The reason for requiring the limitation proceeding to be completed first is to permit the vessel owner to receive the benefit of his insurance. Where the same purpose can be accom-

plished otherwise—*e. g.*, where, as in the present case, the direct action and the limitation proceding are consolidated—or where a chronology would serve no purpose—*e. g.*, where there is only one claimant—the *Cushing* chronology need not be followed. *See* Guillot v. Cenac Towing Co., 366 F.2d 898 (5th Cir. 1966) ; Ex parte Tokio Marine & Fire Ins. Co., 322 F.2d 113 (5th Cir. 1963) ; Torres v. Interstate Fire & Cas. Co., 275 F.Supp. 784 (D.P.R.1967) ; In re Independent Towing Co., 242 F.Supp. 950 (E.D.La. 1965).

18. *See* 46 U.S.C. § 185 (1964).

19. See Note, Shipowners' Limited Liability, 3 Colum.J.L. & Soc.Prob. 105, 114–15 (1967). *See* generally Comment, Limitation of Liability in Admiralty: An Anachronism from the Days of Privity, 10 Vill.L.Rev. 721 (1965).

permitting Olympic to recover its entire loss from the sinking of its vessel; the better policy would seem to favor slightly higher premiums, if really necessary, in order to avoid instances of severe loss. And finally, we do not think that the Limitation Act was intended to limit the amount of premiums paid by vessel owners on insurance. Therefore, we hold that the possibility of higher premiums is an insufficient basis for permitting an insurer to limit its liability.

■■■ The amicus also contests the jurisdiction of the district court under the proviso to subsection 1332(c) of the Judicial Code which states

> [t]hat in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business.[20]

The amicus argues that the direct action must rest upon diversity jurisdiction and that the quoted proviso destroys diversity between Olympic and Nebel's insurer. It is not necessary for us to decide that question because the proviso was not enacted until August 14, 1964, while Olympic's direct action was filed in the district court on January 30, 1962. Thus it is clear that the new proviso is inapplicable to this case. Neither do we decide whether suit could be filed directly

against the insurance company under principles of maritime law under allegations that the insurance policy is a maritime contract.

### III

■■■ The appellants' remaining contentions depend upon the interpretation of Louisiana law. At the threshold, the amicus contends that Louisiana's direct action statute does not apply to marine insurance policies at all. This argument is made in the face of Coleman v. Jahncke Serv., Inc. where this court stated:

> The direct action statute, by its terms, applies to every "policy or contract of liability insurance." * * * "There is no indication in Sec. 655 that the Louisiana legislature intended to deny the right of direct action to persons covered by marine policies, while extending it to all others."[21]

Therefore, this question is now settled until the Louisiana courts decide the matter differently.

■■■ Next, the appellants and the amicus contend that the insurance policy involved here—a Protection and Indemnity Policy—does not permit a direct action. Although the appellants quote several clauses from the policy,[22] the clause primarily relied upon states in pertinent part:

> In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up

---

20. 28 U.S.C. § 1332(c) (1964).

21. 341 F.2d 956, 960–961 (5th Cir. 1965) *quoting from* Cushing v. Maryland Cas. Co., 198 F.2d 536, 538 (5th Cir. 1952).

22. We have considered and rejected the appellants' construction of the other clauses which provide as follows:
It is expressly understood and agreed if and when the assured has any interest other than as a shipowner in the vessel named herein, in no event shall this Company be liable hereunder to any greater extent than if the assured were the sole owner and entitled

to petition for limitation of liability in accordance with present and future law.
The assured shall at the option of this Company permit this Company to conduct, with an attorney of this Company's selection, at this Company's cost and expense and under its exclusive control, a proceeding in the assured's name to limit the assured's liability to the extent, and in the manner provided by the present and any future statutes relative to the limitation of a shipowner's liability.

to the amount hereby insured * * * such sums as the assured * * * shall have become legally liable to pay and shall have paid on account.

The difficulty with the argument is that the no-action clause quoted above is ineffective under Louisiana law.[23] The direct action statute becomes a part of every insurance policy having effect in Louisiana as though written into the policy.[24] As the court stated in Hidalgo v. Dupuy:

> The statute simply voids any policy clause which conditions the right of the injured person to enforce against the insurer its contractual obligation to pay the insured's debt upon, as prerequisite, the obtaining by the injured person of a judgment against the insured.[25]

Underlying this principle is the public policy of Louisiana which proclaims that liability insurance—including purported indemnity insurance—is issued primarily for the protection of the public rather than the insured.[26] We think it clear, therefore, that the clause relied upon here does not preclude a direct action.

The appellants' final contention is that the right to limit liability is not a "personal defense" under Louisiana law and, therefore, is available to Nebel's insurer in this case. The pertinent Louisiana statute provides:

> A codebtor *in solido*, being sued by the creditor, may plead all the exceptions resulting from the nature of the obligation, and all such as are personal to himself, as well as such as are common to all the codebtors.

He can not plead such exceptions as are merely personal to some of the other codebtors.[27]

Although there is no definitive holding in point by the Louisiana courts, the appellants and the amicus argue by analogy that the limitation of liability is not a defense which is "merely personal to some of the codebtors" but rather one "resulting from the nature of the obligation." The essence of the argument is stated with admirable conciseness in the appellants' brief:

> The shipowner's obligation to his debtors, i. e., the claimants, for injuries to persons and property arising out of a marine disaster leading to a limitation proceeding, is limited in amount by the Limitation Statutes to the value of the vessel and pending freight. There can be no reason why such a statutory exception or exemption from liability, beyond the value of the vessel, cannot be said to result from the nature of the shipowner's obligation under Article 2098, just as a contractual limitation in amount can be said to result from the nature of the obligation. His obligation to his debtors is fixed and limited by the law of the land—an Act of Congress. It follows then, that the defense of limitation of liability is *not* a personal defense.

We are not, however, persuaded by this strained analogy. The nature of a "personal defense" under Louisiana law is explained in Judge Ellis' excellent opinion in Alcoa Steamship Co. v. Charles Ferran & Co.[28] After pointing out a number of defenses which have been held to be "personal" under Louisiana

23. See Ruiz v. Clancy, 182 La. 935, 162 So. 734, 735 (1935).

24. Humble Oil & Refining Co. v. M/V John E. Coon, 207 F.Supp. 45, 49 (E.D. La.1962).

25. 122 So.2d 639, 644–645 (La.App.1960).

26. *See* Musmeci v. American Automobile Ins. Co., 146 So.2d 496, 501 (La.App. 1962) ; Mid-South Ins. Co. v. Lewis, 236 F.Supp. 739, 741–742 (W.D.La.1964), aff'd Jones v. Mid-South Ins. Co., 358 F.2d 887 (5th Cir. 1966).

27. LSA–C.C. art. 2098 (1952). It is undisputed that Nebel and its insurer are codebtors *in solido* under Louisiana law.

28. 251 F.Supp. 823, 831 (E.D.La.1966), aff'd, 383 F.2d 46, 56 (5th Cir. 1967).

law—e. g., infancy,[29] coverture,[30] charitable immunity,[31] governmental immunity,[32] bankruptcy.[33] Judge Ellis stated:

> Amongst these apparently varied "personal" defenses, one common denominator is discernible—each person possessing a "personal" defense obtained that defense because the law granted it to all members of his class as a matter of public policy. The personal defense attaches to the status. Hence parents, children, husbands, wives, governmental units, charitable organizations, bankrupts, lunatics, interdicts, vessel owners, and the like possess a defense denied their respective insurers.[34]

There is no question that the Limitation Act was designed to assist the maritime industry and that it was in no way intended to benefit the insurance industry.[35] Thus it is patent that statutory limitation of liability is only available to a shipowner; the status of insurer is not covered by the public policy underlying the Limitation Act. We therefore hold that limitation of liability under the federal statute is a personal defense which cannot be availed of by an insurer under Louisiana law.[36]

Accordingly, the judgment of the district court is affirmed in all respects.

Affirmed.

29. Rouley v. State Farm Mut. Automobile Ins. Co., 235 F.Supp. 786, 793 (W.D.La. 1964) ; LSA–R.S. 9 :571.

30. Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191 (1935).

31. Lusk v. United States Fid. & Guar. Co., 199 So. 666, 667 (La.App.1941).

32. Brooks v. Bass, 184 So. 222, 224 (La. App.1938).

33. See Simmons v. Clark, 64 So.2d 520, 523 (La.App.1953).

34. 251 F.Supp. 823, 831 (E.D.La.1966).

35. See Maryland Cas. Co. v. Cushing, 347 U.S. 409, 421–422, 423, 436, 74 S.Ct. 608, 98 L.Ed. 806 (1954) ; 3 Benedict on Admiralty § 598 (6th ed. 1940). See generally Note, Shipowners' Limited Liability, 3 Colum.J.L. & Soc.Prob. 105 (1967).

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM.

The petition for rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), Rehearing En Banc is also denied.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, and CARSWELL, Circuit Judges.

JOHN R. BROWN, Chief Judge, WISDOM, THORNBERRY, GODBOLD, DYER and SIMPSON, Circuit Judges, would grant the petition for rehearing en banc.

JOHN R. BROWN, Chief Judge, with whom DYER and SIMPSON, Circuit Judges, join, dissenting:

I agree with much of the Court's opinion. I disagree with the result and some of the opinion which, to me, leads to an incorrect result.

36. The appellants attempt to analogize the Limitation Act to the Longshoremen's & Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. (1964), must fail. Since the Longshoremen's Act destroys the right to relief outside the statutory coverage, it would follow that a claimant could not proceed against the insurer on a nonexistent right to relief. The Limitation Act merely provides a special benefit to shipowners; it does not destroy the right to relief.

The appellants also raise the question whether other limitation statutes are personal defenses. It is sufficient in this case that we find that the benefit permitted by the Limitation Act is a matter personal to the shipowner; the determination of the personal or nonpersonal nature of defenses permitted by other statutes will occur soon enough when cases involving those statutes arise.

I am first in agreement that we can no longer postpone the evil day of judgment. I agree that the time has come for an answer "to what fifteen years later has perhaps turned out to be something less than the riddle or 'grisly spectre' supposed." [1]

I agree also that the Limitation of Shipowner's Liability Act, 46 U.S.C.A. § 183 et seq., was not intended to, and does not, afford protection to insurers as such. But this is a long way from concluding that the Louisiana Direct Action Statute, L.R.S. 22:655,[2] by the operation of the distinctive Louisiana Codal Provision of Article 2098,[3] can alter the distinctive uniformity of the Admiralty to impose on an underwriter liabilities beyond those for which the assured is legally liable.

At the outset the Court's first mistake, in my judgment, is to read the enigmatic 4–1–4 *Jane Smith* [4] decision as anything other than a decision for that day and

1. Continental Oil Co. v. London Steamship Owners Mut. Ass'n, Ltd., 5 Cir., 1969, 417 F.2d 1030 [Sept. 23, 1969] citing in notes 5 and 6 Guillot v. Cenac Towing Co., 5 Cir., 1966, 366 F.2d 898, 1966 A.M.C. 2685; Ex Parte Tokio Marine & Fire Ins. Co., 5 Cir., 1963, 322 F.2d 113, 1964 A.M.C. 308; Coleman v. Jahncke Service, Inc., 5 Cir., 1965, 341 F.2d 956, 957, 1966 A.M.C. 1115, *cert. denied*, 1966, 382 U.S. 574, 86 S.Ct. 538, 15 L.Ed.2d 465.

2. The Statute provides:

"No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State.

It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy." LRS 22:655 (Supp.).

3. "Art. 2098. Defenses available to debtors in solido

Art. 2098. A codebtor *in solido*, being sued by the creditor, may plead all the exceptions resulting from the nature of the obligation, and all such as are personal to himself, as well as such as are common to all the codebtors.

He can not plead such exceptions as are merely personal to some of the other codebtors." La.Civ.Code art. 2098.

4. Maryland Cas. Co. v. Cushing, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806, 1954 A.M.C. 837.

case only. To construct a majority, Mr. Justice Clark with the swing vote thought it inappropriate to reach ultimate decisions on these disturbing questions when the whole thing for that case might well wash out if decision were deferred until liability was determined or the limitation proceedings concluded. That is the history of that case as we. and others have applied it.[5] Thus the Court errs in proceeding as though the Supreme Court has resolved either the construction, application and interpretation of the Louisiana Statute, or, equally important, the extent to which its impact upon the underwriter can amount to a direct burden on the shipowner in excess of that which Congress has determined he shall bear when entitled to limit his liability under the Statute.[6]

As I view it, the basic defect in the Court's opinion is that, from a Louisiana point of view, it misconstrues entirely the meaning of the Louisiana Direct Action Statute. Describing the effect of the Statute we recently said that it "legislatively expunges the traditional 'no action' clause of a liability policy to permit a party injured in Louisiana to sue the liability insurer directly without going through the process of suit and judgment against the Assured." Continental Oil Co., note 1, *supra* at 1031–1032. The Statute was not intended to create a new liability against the insurer. It was intended merely to afford a direct, non-circuitous means of satisfaction of a claim judicially determined to be owing by the assured and which is within the limits and terms of the coverage afforded by the insurance policy. This is the plain language of the Act itself:

> "It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the de-

---

5. *See Guillot* and *Ex Parte Tokio*, note 1 *supra*.

6. From reading the briefs one gets the impression that the impact of the Direct Action Statute on the limitation of liability proceeding and on the unlimited liability of the insurer was an after-thought upon the completion of the trial of the merits of the case. So much is this so that this record scarcely contains much information other than the insurance policy and a limited, sketchy outline of the possible economic effect which the underwriter's liability may have on the shipowner's loss for the casualty in question. This is stressed because this dissent does not advance the proposition that the record demonstrates that by imposing unlimited liability on the insurer there will be an economic loss to the shipowner which sacrifices in substantial part the protection which the Congressional Act affords to one found to be without fault or privity. Rather it is to emphasize the importance of that factor for a full evidential development. The criticism I hold is that this is ruled out absolutely as a factor. This reads the 4–1–4 riddle as though the justices intended to, and did, determine an economic fact as a matter of law.

We are naive if in this era we suppose that the losses paid by an insurer are of no concern to the assured. He who calls the tune still pays the fiddler. Modern, large business uses a variety of sophisticated insurance coverages, the effect of which is that by a succession of layers of underwriters, excess, catastrophe umbrella coverages, etc., the assured really pays for his own losses plus a management fee for the stop-loss. A payment of $1 million by the direct insurer in excess of the limited value is bound to cost the shipowner something.

Although this record is sketchy, the briefs tell us without contradiction that "it has been estimated that excess insurance rates would rise from 25% and 50% based upon the affidavit of J. K. Sadler, 1965, submitted in support of the motion for rehearing in In the Matter of Indep. Towing Co., E.D.La., 1965, 242 F.Supp. 950." Likewise insurance costs were very much at the bottom of the *Morro-Castle*-induced 1936 amendments to the Limitation of Liability Act. "In the testimony preceding the 1963 amendments to the Limitation Act, it was brought home to Congress that one of the benefits to shipowners of their right to limit was lower insurance premiums. See testimony of Charles S. Haight before the House Committee on Merchant Marine and Fisheries on H.R. 9969 Part IV, 74th Cong. 2d Sess., 66–67, 129, and testimony on Ira A. Campbell before the same committee on H.R. 4550, 74th Cong. 1st Sess., 136–137."

fenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State." (See note 2, *supra*)

Although it is plain that one of the purposes is to give protection to the injured party, the underwriter's liability is geared directly to that of the assured. For the Act goes on to provide:

"It is also the intent of this section that all liability policies *within their terms and limits* are executed for the benefit of all injured persons * * * and that it is the purpose of all liability policies to give protection and coverage to all insureds * * * for any legal liability said insured may have as or for a tort-feasor *within the terms and limits of said policy*." (Emphasis added) (See note 2, *supra*).

The Courts of Louisiana and this Court have repeatedly stressed the proposition that it is the underlying liability of the assured, not the liability of the insurer, which is to be determined. If that liability, once determined in a direct action against the insurer, is within the coverage of the policy, then the underwriter has a direct responsibility. But even though it is covered, the liability of the insurer is restricted to that afforded by the insurance contract, with only one exception of moment here—the "No Action" clauses are ineffectual.[7]

For example, in Finn v. Employers' Liability Assurance Corp., La.Ct.App., 1962, 141 So.2d 852, 864, the Court states:

"Nor do we find any merit in the contention that the direct-action statute created separate or distinct causes of action, one against the insurer alone and another against the insurer and the insured. The statute is remedial in character, rather than substantive, and does not create causes of action."

Similarly in Mock v. Maryland Casualty Co., La.Ct.App., 1942, 6 So.2d 199, 201–202, the Court declared:

"The statute merely affords a remedy and permits a direct action not under any theory that by the contract of insurance any right is created in plaintiff against the insurer but merely on the ground that, by the tort, rights are created which are permitted to be asserted directly against the insurer of the party at fault."

All of our cases sound the same note. We emphasize this in Ex Parte Tokio Marine & Fire Ins. Co., 5 Cir., 1963, 322 F.2d 113, 116:

"And we are now clear that the direct action insurer stands as a party-litigant in exactly the same shoes as the assured."[8]

We phrased it this way in Degelos v. Fidelity & Casualty Co., 5 Cir., 1963, 313 F.2d 809, 815:

"Under the Direct Action Statute, the case may proceed against the insurer, but liability depends on legal liability of the assured. Whether, as the Act permits, the assured is joined with the insurer, the standard for recovery is identical."

---

7. The Court is correct in rejecting the contention that this P & I policy (see note 2 of *Continental Oil*, note 1, *supra*) expressly limiting to the underwriter's liability for which the assured as shipowner "shall have become legally liable to * * pay *and shall have paid*" is an indemnity policy requiring prepayment. This is just a salt water version of the No Action clause which the Direct Action Statute outlaws.

For present purposes even less need be said as to the traditional P & I restriction which provides that "when the assured has any interest other than as a shipown-

er," the underwriter shall not "be liable * * * to any greater extent than if the assured were the sole owner and entitled to petition for limitation of liability. * * *" This is obviously intended to exclude liabilities of a kind not related to the ownership or operation of the ship by one standing in a relation to the vessel other than the owner.

8. In a footnote at this point *Tokio*, quoting the intent portions of the statute set out in the text *supra*, states: "The Louisiana Direct-Action Statute emphasizes that it is the liability of the assured which counts."

As a matter of Louisiana law expressed by Louisiana courts, and in our *Erie* role by this Court, the liability of the insurer is that of the assured. What is the liability of a shipowner, as the assured, who causes damage without his privity, or fault? 46 U.S.C.A. § 183. The Limitation of Shipowner's Liability Act is plain. The liability is not to "exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 U.S.C.A. § 183(a).[9]

Whether this is good or wise, good or bad public policy, is not for us to say. Until Congress changes the law, it is our obligation to interpret this Act in keeping with the objective of Congress in its effort to encourage shipping by putting a ceiling on losses which are brought about by circumstances beyond the control of the shipowner and his principal shore-based supervisory staff. This is not legislative largesse extended by Congress to a particular shipowner. It was enacted to encourage shipping by all who would engage in it, their identities completely unknown. It is not intended to extinguish responsibility on the part of the shipowner or to legislatively obliterate an obligation under the law toward those who might be damaged or injured. To the contrary, it is a recognition that *if* any such legal responsibility exists then the liability shall not exceed the value of the vessel after the casualty *unless* the damage has been brought about by circumstances which inculpate the shipowner by acts attributable to him directly or on notions akin to that of vice-principal. The defense

of the Shipowner's Liability Act is one to put a ceiling on recovery.[10]

Unlike sovereign immunity, charitable immunity, minority, coverture, or the like, Shipowner's Limitation Act does not exonerate the shipowner. It merely provides an insulation against the consequences of damage done by agents not standing in the role of a vice-principal. Its background and purpose are described in Butler v. Boston and Savannah Steamship Company, 1889, 130 U.S. 527, 549, 9 S.Ct. 612, 616, 32 L.Ed. 1017, 1022:

"If we look at the ground of the law of limited responsibility of shipowners, we shall have no difficulty in reaching the conclusion that it covers the case of injuries to the person as well as that of injuries to goods and merchandise. That ground is that for the encouragement of shipbuilding, and the employment of ships in commerce, the owners shall not be liable beyond their interest in the ship and freight for the acts of the master or crew done without their privity or knowledge."

In Norwich & New York Transportation Co., v. Wright, 1872, 80 U.S. 104, 116, 13 Wall. 104, 20 L.Ed. 585, 589, it was phrased this way:

"The history of the limitation of liability of ship-owners is matter of common knowledge. The learned opinion of Judge Ware in the case of The Rebecca, 1 Ware, 187–194, leaves little to be desired on the subject. He shows that it originated in the maritime law of modern Europe; that whilst the civil, as well as the common law, made the owner responsible to the whole ex-

---

9. Sec. 183(a) states: "The liability of the owner of any vessel, whether American or foreign, for any * * * loss, or destruction * * * of any property, goods, or merchandise * * * or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

10. Of course under Rule F (see 39 F.R.D. 162) of the Admiralty Rules (see 39 F.R.D. 146–167) the shipowner is entitled in the limitation proceeding to assert (a) a right to complete exoneration and (b) failing that, a right to limit. Actually this merely provides a forum with a concursus because exoneration does not rest upon the Limitation Statute. Exoneration rests upon the applicable principles of maritime law, federal or international, common or statutory.

tent of damage caused by the wrongful act or negligence of the master or crew, the maritime law only made them liable (if personally free from blame) to the amount of their interest in the ship."

Once the shipowner has obtained a decree entitling it to limitation of liability, the vessel and all the owner's assets are insulated from execution or seizure in excess of the limited value. See Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903. The right to limit does not absolve the shipowner of liability which remains unchanged. What it does is put a ceiling on recovery. Oliver J. Olson & Co. v. American SS Marine Leopard, 9 Cir., 1966, 356 F.2d 728, 1966 A.M.C. 1064.

The right to limit liability is not one which inheres in the "person" of the shipowner. It is available to a shipowner of a specific vessel under some circumstances. It is not available under others. It does not turn upon his status as shipowner. And it is not a right which he as shipowner can claim. The right to limit inheres in the nature of the transaction giving rise to the underlying obligation and the shipowner's participation in it under the concepts of "privity or knowledge". See G. Gilmore & C. Black, The Law of Admiralty, Chap. X, §§ 10–22– 10–24, pp. 698–704 (1957).

This ceiling, this insulation, is one that inheres in "the nature of the obligation." La.Civ.Code art. 2098 (note 3 supra). If the circumstances giving rise to the law's imposition of the legal consequences are such as to satisfy "the privity or knowledge" standard, the shipowner's liability is of a limited character. If, on the other hand, the circumstances are such that "privity or knowledge" is not met, then the shipowner's liability is an unlimited one.

On this approach it is a direct interference with and restraint upon the congressional policies assuring limitation of liability to the value of the vessel after the casualty to treat the shipowner's right to limit as the so-called personal defense under the Louisiana Codal Article 2098 (see note 3 supra). Matter of Independent Towing Co., E.D.La.,1965, 242 F.Supp. 950, 1965 A.M.C. 818, is therefore, in my judgment, completely wrong. In this approach the technical Codal provision on obligations in solido comes into a direct clash with maritime principles and congressional policies. However obscure the Louisiana dialectic might be to many of us between "exceptions personal to the debtor" as distinguished from "exceptions resulting from the nature of the obligation," it is clear to me that this is in no sense a "personal" defense of the caliber of sovereign immunity, charitable immunity, or the like.

The unrealistic nature of the Court's holding that this federal statutory policy is a "personal" defense unavailable to the direct liability insurer under Art. 2098 is revealed by a few illustrations of highly probable situations.

A classic one is a collision in inland waters caused solely by the flagrant negligence of a compulsory pilot conning the vessel. In that situation the shipowner has no personal liability. A judgment cannot be rendered against the shipowner in personam. Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, 1901, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155; G. Gilmore & C. Black, The Law of Admiralty, Chap. VII, § 7–16, pp. 429–32. Of course the vessel is liable in rem, The SS China v. Walsh, 1869, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67. But the latter remedy might be ineffectual from lack of sufficient value, the total loss of the vessel, by a sinking following the collision, etc.

Suppose in such a situation the operator (say, as bare-boat charterer) has a liability insurance policy which covers the in personam liability of the shipowner only with in rem liability specifically excluded. Of course it is the navigational operation of the vessel which gives rise to the claim and there would be a judicial declaration that such operation was faulty, that is, negligent. But there could be no decree against the owner since no in personam judgment

could be rendered. But on the Court's reasoning, the insurer would be liable under the Direct Action Statute because this defense of non *in personam* liability would be personal to the shipowner. It is quite evident that any such result is rewriting the contract of insurance for it makes an insurer liable for risks which it did not insure since it insured only those risks for which the assured had an *in personam* responsibility.

In the same situation suppose the shipowner has no *in rem* insurance (such as Hull) but it does have a typical comprehensive general liability policy issued on the usual casualty form which specifically excludes liabilities arising from the ownership or operation of watercraft under the now familiar Watercraft Exclusion. To allow recovery against the insurer under the Direct Action Statute in such a case would again be to rewrite the contract entirely. It would legislatively extinguish the Watercraft Exclusion. It is unlikely that the Court would ever go that far because at that point the Court would have to recognize that this was one of "the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured * * *" (L.R.S. 22:655, note 2, *supra*). But this is no more a lawful term of the policy than that contained in the P & I policy involved here. By its express terms the underwriter confines his responsibility to the liabilities imposed by law on the assured. The policy provides that the underwriter "undertakes to pay up to the amount hereby insured * * * such sums as the *assured* * * * shall have become legally *liable* to * * * and shall have paid." [11] (emphasis added).

Another illustration readily comes to mind. A collision on inland navigable waters of Louisiana between SS Law and SS Order in which the Court declares a 50/50 mutual fault outcome as a result of negligence of both vessels. The damages of SS Law are $100,000 and those of SS Order are $50,000. Of course, it is the rule in admiralty that where both vessels are in fault the sums representing the damage sustained by each must be added together and the aggregate divided between the two." The Sapphire, 1873, 85 U.S. (18 Wall.) 51, 56, 21 L.Ed. 814, 816. The result is that the vessel suffering the lesser damage pays one-half of the difference so that on striking the balance SS Order would pay to SS Law $25,000.[12] Suppose, however, that the owner of SS Order has a liability policy with policy limits of $200,000. On the Court's reasoning the liability of SS Order to pay only $25,000 is "personal". Paraphrasing the unexpressed, undisclosed reasoning, this is because the limitation of $25,000 relates to this shipowner in this situation and does not arise out of the nature of the liability independent of this specific situation.

---

11. As in note 7, *supra*, I would emphasize again that I agree that the Direct Action Statute extinguishes the requirement of prepayment by the assured as a condition to underwriter liability. By the act there is no distinction between a liability policy and an indemnity policy. But these policy provisions do reflect the clear purpose of the underwriter to pay only such claims as are based upon the liability imposed by law on the assured. If there is no liability or if that liability is restricted or otherwise limited, then that is the position of the insurer as well.

12. It works this way.

| | | |
|---|---|---|
| Damages of SS Law | $100,000 | |
| Damages of SS Order | 50,000 | |
| One-half of the difference | 25,000 | |
| SS Law bears own loss | 100,000 | |
| less from SS Order | 25,000 | |
| | | $75,000 |
| SS Order bears own loss | 50,000 | |
| plus payment to SS Law | 25,000 | |
| | | $75,000 |
| Total Damage | | $150,000 |

Adopting that course, the liability insurer of SS Order would have to pay to SS Law the full $100,000 and, in any event, an additional $25,000.

But I doubt that the Court would treat that as "personal". It would adhere to maritime principles and declare that the maximum *substantive* liability of SS Order is $25,000 and restrict recovery to that amount from the shipowner and its direct action liability insurer.

If the Court's present decision would lead it to hold the $25,000 limitation to be "personal", then one sees how a Louisiana local, intra-debtor policy is allowed to overlap into the federal exclusive domain. If, on the other hand, the Court would reject the idea of "personal" defense, one sees quickly how unrealistic it is to tie the "personal" defense to the shipowner's right to limit liability.

Thus, to the above illustration add the further wrinkle that SS Order is allowed to limit liability, and the limited value is $40,000. Without the benefit of this Court's present decision on direct action liability, all the owner of SS Law would get is $25,000, being one-half the difference between the two.

To see where this leads, some salt-water background is helpful. At an early date an effort was made to import into the American practice the English rule which allowed recovery before applying the limitation fund. On that theory SS Law with $100,000 damages recovering one-half its losses would exhaust the value of SS Order ($40,000). But that would make the losses of SS Order $90,-000 because it would (a) suffer its own $50,000 damage and (b) pay one-half of the losses of SS Law up to the value of $40,000.[13]

But in The North Star, 1882, 106 U.S. (16 Otto) 17, 28, 1 S.Ct. 41, 51, 27 L.Ed. 91, 96, the Supreme Court declared that to follow any such English rule would "often result, and would in this case result, in positive injustice." The true rule, so the Court held, was this: "The rule of admiralty in collision cases, as we understand it, is that, where both vessels are in fault, they must bear the damage in equal parts, the one suffering least being decreed to pay to the other the amount necessary to make them equal, which amount, of course, is one-half of the difference between the respective losses sustained. When this resulting liability of one party to the other has been ascertained, then, and not before, would seem to be the proper time to apply the rule of limited responsibility, if the party decreed to pay is entitled to it."

In reaching this result, the Court rejected the contrary view which allows each to recover one half its own damage from the other without regard to limited liability rather than bear one half of the total losses sustained by both.

And yet, that is exactly what the Court's action allows under our present decision, only more so. For applying the usual rule, SS Law recovers one half of the difference or $25,000, and under the present decision it recovers not less than

13. 

| | | |
|---|---|---|
| SS Law: | | |
| Damages | $100,000 | |
| Recovers from SS Order Limitation Fund | 40,000 | |
| Net Loss | | $60,000 |
| SS Order: | | |
| Own damage | $50,000 | |
| Payment to SS Law from Limitation Fund | 40,000 | |
| Net Loss | | $90,000 |

$25,000 from the direct action liability insurer of SS Order.[14]

The irony of this is that with no limitation of liability the maximum liability of SS Order *and* its direct action insurer would be $25,000 (see note 12, *supra*). Here, by the mere presence of a limitation proceeding, with a limited value in excess of the substantive liability due, what is totally irrelevant now becomes a "personal" defense to impose on the insurer a liability which the assured does not have.

It is impossible in this situation to find any sort of "personal" defense in SS Order which on the Court's ruling is not available to the direct action liability insurer. Under the law SS Order has a liability for only one-half of the total damages suffered by both. Under the law this cannot exceed the $50,000 sustained by it and one-half the difference, $25,000 payable to SS Law. That is the maximum liability, with or without limitation of shipowner's liability.

Suppose the tables are reversed and it is SS Law with a liability policy that is entitled to limit liability with the value after the casualty being $40,000. Under *The North Star,* SS Order pays $25,000, which is one half of the difference between the two. SS Order would collect nothing. But under the Court's decision, since she sustained $50,000 in her own losses and SS Law was held also at fault, SS Order gets another $25,000 from the direct action liability insurer to make a total recovery of $50,000—an amount which is not one-half of the total losses, but 100% of her own loss. Again the

mere circumstance of an irrelevant limitation proceedings somehow turns a substantive non-limitation-of-shipowner's-limited-liability into a "personal" defense, which thereby subjects the insurer to a liability the assured did not have.

In neither situation may this possibly be described as a "personal" defense. The only distinction between the two is that in the former the pursued (SS Order) had the lesser damages and was limiting liability while in the latter illustration the pursued had greater damage and was limiting liability. Whether this is really a distinction or not is highly debatable. But one thing is certain. In no sense in either situation is it a result of a "personal" status, claim, right, or defense available solely to the assured unrelated to the underlying circumstance, transaction or occurrence giving rise to liability.

As long as the Direct Action Statute subjects the insurer to no greater liability than the assured would have, it fulfills the Louisiana policy of public protection and avoids troublesome questions of conflict between state and federal maritime law. The Court's reading rewrites the contract, imposes liability beyond that of the assured and ignores substantive limitations on liability under maritime principles. The essential uniformity of the admiralty is at an end when for a like casualty across the line in Texas the "liability" of the shipowner is less—by the amount of total damages and the policy limits—than it is in Louisiana.

Not even a Delphic voice can unriddle 4–1–4 that much.

14. SS Law:

| | | |
|---|---|---|
| Recovers from SS. Order | | |
| ½ Difference | $25,000 | |
| Direct Action Insurer | 25,000 | |
| Total Recovery | | $50,000 |